## DISTRICT COURT FOR GRADY COUNTY
## STATE OF OKLAHOMA

|  |  |
|---|---|
| (1)  XOUCHI JONATHAN THAO, SPECIAL ADMINISTRATOR FOR THE ESTATE OF KONGCHI JUSTIN THAO, <br><br> PLAINTIFF, <br><br> v. <br><br> (2)  GRADY COUNTY CRIMINAL JUSTICE AUTHORITY, <br><br> (3)  JAMIE MEYER, IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES, <br><br> (4)  JOHN BAKER, IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES, <br><br> (5)  RALPH BEARD, IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES, <br><br> (6)  JIM WEIR, IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES, <br><br> (7)  JACK WEAVER, IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES, <br><br> (8)  JIM GERLOCK, IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES, <br><br> (9)  TREVOR HENNEMAN, IN HIS INDIVIDUAL CAPACITY, <br><br> (10) JOHN AND JANES DOES 1-10, <br><br> DEFENDANTS. | CASE NO.: CJ-19-287 <br><br> FILED IN DISTRICT COURT <br> Grady County, Oklahoma <br><br> NOV 1 2 2019 <br><br> LISA HANNAH, Court Clerk <br> By _____ Deputy |

**PETITION**

EXHIBIT 2

Plaintiff Xouchi Jonathan Thao, as co-Special Administrator for the Estate of Kongchi Justin Thao, ("Estate") for the cause of action against the above-named Defendants, would state as follows:

## I.

### INTRODUCTION

1. Plaintiff brings this civil rights action for damages resulting from the unnecessary death of Kongchi Justin Thao ("Justin") at the Grady County Criminal Justice Center ("Center"). Justin was a 20-year-old young man who was about to complete a one-year sentence for a federal marijuana offense when he was housed for a night at the Center while being transported back to his home state of California. The Center operator, the jail administrator, and jailers at the facility violated numerous laws and jail standards while Justin was in their custody related to both the physical plant and facility operations. As a direct and proximate result of these violations, the Defendants did not respond to Justin's acute medical and/or psychiatric crisis over several hours, and that failure resulted in Justin's death on November 18, 2017. This unnecessary tragedy caused Justin to suffer and his family to experience untold grief and loss.

## II.

### PARTIES, JURISDICTION, VENUE

2. Estate is a resident and citizen of the State of California. Xouchi Jonathan Thao, Justin's brother, is Special Administrators for the Estate of Kongchi Justin Thao.

3. The Grady County Criminal Justice Authority ("Authority"), is a Title 60 public trust located in Grady County, Oklahoma and formed pursuant to the laws of the State of Oklahoma. The Authority has a non-delegable statutory responsible for providing a jail facility for Grady County, Oklahoma, that is adequate for the safe-keeping of inmates. *See* 57 O.S. § 41.

Trustees listed below are trustees for the Authority. In addition to the non-delegable duty to provide a physical plant adequate for the safe-keeping of prisoners, Trustees have final policymaking authority over facility operations, employee training, and hiring and supervising the facility administrator.

4. Jim Gerlock ("Gerlock"), is the administrator for the Center. Gerlock is either a supervisor over the Center, or an authorized decision-maker sufficient to confer final policy-policymaking authority for the operation of the Center, including training and the creation, implementation, and enforcement of facility policies.

5. Trustees Jamie Meyer, John Baker, Ralph Beard, Jim Weir, and Jack Weaver, (collectively the "Trustees"), are the individuals with final decision-making authority that comprise the Grady County Criminal Justice Authority.

6. Trustee John Baker is an executive at the First National Bank in Tuttle, Oklahoma. The Authority has a significant banking relationship with First National Bank, which creates a financial interest for Baker to ignore the dangerous physical plant at the Center and the inadequate training of its jailers, in order to keep business flowing from the Authority to his bank.

7. Trevor Henneman ("Henneman") is or was an employee of the Authority at the time of the incident involving Justin. He is sued in his individual capacity.

8. John and Janes Does 1-10 are or were agents and employees of the Authority at the time of the incident involving Justin.

9. The events complained of below occurred in Grady County, Oklahoma, which is within the territorial jurisdiction of this Court, making jurisdiction and venue proper.

## II.

### STATEMENT OF FACTS

10. The Authority took custody of Kongchi Justin Thao ("Justin") at the Jail around 6:00 p.m. on November 15, 2017.

11. Justin was being transported to California by the United States Marshal's Service, which placed him at the Center pursuant to a federal contract. He was nearing the completion of his federal sentence for conspiracy to possess marijuana with intent to distribute.

### A. POLICIES AND PRACTICES

12. Operation of the Center is governed by Oklahoma Statutes and the Oklahoma Department of Health's Jail Standards ("Jail Standards"), which Oklahoma jails must meet to lawfully continue operation.

13. Oklahoma Statutes require that Authority, Trustees, and/or Gerlock provide "appropriate training for jailers in accordance with the jail standards promulgated by the State Department of Health." However, the Authority, Trustees, and/or Gerlock provided *no training at all* to some or all of the jailers responsible for protecting Justin's life and well-being while he was held at the Center.

14. The Jail Standards require that: "Medical triage screening *shall* be performed on all prisoners immediately upon admission to the facility and before being placed in the general population or housing area (emphasis added)."

15. The Center never provided Justin with a medical triage screening.

16. The Jail Standards require that each location where prisoners are confined "shall be equipped with an intercommunication system that terminates in a location that is staffed twenty-four (24) hours-a-day and is capable of providing an emergency response."

17. Justin yelled numerous pleas indicating he was having a crisis that demanded immediate attention from jailers. These pleas included:

"I'm going to commit suicide"

"I'm on "f---ing drugs, leave me alone"

"F---ing kill me"

"Help me, please"

"I'm f---ing dying"

18. No jailer responded to Justin's cries for help.

19. The Jail Standards require that: "A jailer shall be on duty at all times at each location where prisoners are confined or the observation shall be conducted by closed circuit TV."

20. No jailer was on duty at the location where Justin was confined and no observation of Justin was conducted by closed circuit TV, apart from when he was placed in his cell and when he was removed from his cell after being found unresponsive and hanging from by a towel. The cell where he was confined was not otherwise visible to a jailer unless the cover to the small window was manually lifted. Even then, jailers were unable to observe the entire cell through the small window. The cell was not visible at all through closed circuit TV.

21. Jailers observed Justin only twice during the almost two hours he was in the segregated cell and had not checked on him for an hour and 15 minutes prior to finding him unresponsive in his cell.

22. The Jail Standards require that: "Those individuals who appear to have a significant medical or psychiatric problem, or who may be a suicide risk, shall be transported to the supporting medical facility as soon as possible. They shall be housed separately in a location where they can

be observed frequently by the staff at least until the appropriate medical evaluation has been completed."

23. The Jail had not medically screened Justin, did not transport him to a medical facility based upon the medical or psychiatric problems he was so obviously experiencing, and did not house him in a location where he could be observed frequently by staff despite his pleas for help.

24. Because of Justin's medical and psychiatric distress, the decision to house him in a cell lacking supervision exposed Justin to a substantial risk of serious harm from the lack of adequate supervision.

25. In July 2015, the Oklahoma Jail Inspection Division cited the Authority for deficient supervision practices following an incident in Cell 127, the cell adjacent to the one in which Justin was housed. Those are the only segregation cells at the Center, and upon information and belief, the two cells share the same physical layout.

26. Authority, Trustees, and/or Gerlock had actual knowledge of the supervision deficiency, or should have had such knowledge, and responded to the risk by adding a camera that recorded the inside of Cell 127. However, they did nothing to alleviate the identical risk to prisoners presented by Cell 126.

27. During the July 2015 incident, an inmate suffered a medical episode and was found unresponsive. The Oklahoma Jail Inspection Division cited the Authority for deficient supervision practices related to the use of the segregation cell.

28. Notwithstanding the July 2015 incident and notice of the risk presented by the physical layout of the two segregation cells, Authority, Trustees, and/or Gerlock expected staff to

continue using Cell 126 as they did prior to the July 2015 incident despite actual knowledge of the risk to persons like Justin and those similarly situated from a lack of adequate supervision.

29. Despite actual knowledge that the layout of Cell 126 posed an unreasonable lack-of-supervision risk, and despite an expectation that staff would continue using Cell 126 for segregation purposes, Authority, Trustees, and/or Gerlock compounded the danger by failing to adequately train the staff to conduct meaningful and timely welfare checks to accommodate for the dangerous physical plant they continued to use.

30. The Authority, Trustees, and/or Gerlock knew from the 2015 reprimand that unnecessary harm to an inmate was a highly predictable or plainly obvious consequence of continuing to use Cell 126 as a segregation cell without providing additional training to compensate for the dangerous physical plant. The necessary training would have emphasized the critical need to perform thorough and frequent welfare checks of people housed in the Center's segregation cells, and the death or permanent injury that would result from the failure to perform such checks.

31. At the Authority meeting held November 16, 2017, the trustees unanimously voted to move a significant sum of money to First National Bank where trustee John Baker is an executive. At this same meeting, Gerlock informed the Authority of Justin's suicide attempt, but told them he "didn't succeed." Justin's suicide was never discussed again.

32. As a direct and proximate result of the dangerous condition at the Center and the failure to train staff, jailers placed Justin in Cell 126, a segregated cell where he could not be observed readily by staff and where he was not monitored in any meaningful way. Thus, the same deficient supervision practice for which the Oklahoma Jail Inspection Division cited the Authority in July 2015 was the moving force behind Justin's death.

33. Upon information and belief, the written policies and unwritten practices detailed above are sufficiently longstanding and widespread at the Center to have the force and effect of law, and each was enacted, enforced, and maintained by Authority, Trustees, and/or Gerlock despite knowledge of a pattern of unlawful behavior that exposed prisoners to a substantial risk of death or other serious harm.

34. Alternatively, even if the actions and omissions of the Authority, Trustees, and/or Gerlock were not a custom with the force and effect of law, a constitutional violation was a highly predictable or plainly obvious consequence of Authority, Trustee, and/or Gerlock's failure to provide a safe physical plant, adequate training, adequate supervision, and medical intake screenings.

35. The written policies or unwritten practices set forth above were the moving force behind the injuries and damages suffered by the Estate and for which Authority, Trustees, and/or Gerlock are liable.

**B.  JUSTIN'S UNNECESSARY DEATH**

36. After Justin first arrived at the Center he was placed in a housing unit with other federal prisoners. When a nurse entered the housing unit, a jailer claimed Justin advanced in her direction. One jailer easily subdued Justin and handcuffed him behind his back without resistance from Justin. Jailers then transported Justin to a different part of the Jail.

37. Six jailers accompanied Justin in an elevator during the transport. Although Justin remained handcuffed behind his back, did not resist the jailers in any way, and was vastly outnumbered, Henneman used his TASER to maliciously and sadistically drive stun Justin several times for the purpose of causing pain, and with no legitimate penological purpose.

38. Audio recorded during the incident reveals that Justin questioning whether jailers or inmates were trying to kill him. The seriousness of this dialogue reflects the dangerous medical and psychiatric distress Justin was experiencing.

39. Around 2:40 a.m., jailers then placed Justin in Cell 126, which had no video monitoring inside the cell and could not be seen by the video outside the cell or by standing outside the cell, unless a jailer walked to the solid cell door and lifted the cover over the small window.

40. Jailers placed Justin in Cell 126 despite actual knowledge that he had not received an intake medical screening as required by the Oklahoma Jail Standards.

41. Justin's condition and placement in the dangerous segregation cell required welfare checks more frequently than one-hour intervals, and the individual John and Janes Does 1-10 had actual knowledge, or should have known, that welfare checks in excess of 15-minute intervals exposed Justin to a substantial risk of death or other serious harm.

42. Justin remained in Cell 126 for approximately 113 minutes. During that time, Justin made at least 20 pleas for help such as those specified in ¶ 16, above, indicating that he was experiencing an acute medical and/or psychiatric crisis.

43. About 2:53 a.m., a John Doe jailer provided Justin with a large towel even though the usual practice in the Center is to provide prisoners with small towels that are not of sufficient size to hang oneself. The large towel was particularly dangerous given the limited visibility into the segregated cell and Justin's earlier statements.

44. About 3:07 a.m., a Jane Doe jailer lifted the cover of the window to Cell 126 to observe Justin. That was the last time anyone visually checked on Justin until a staff member discovered him with the large towel wrapped around his neck around 4:34 a.m.

45. On several occasions between 3:07 a.m. and 4:34 a.m., jailers walked past Justin's cell without lifting the cover of the window to observe him.

46. In particular, at 4:16 a.m., a jailer lifted the cover of the window of adjacent Cell 127 to observe the prisoner in that cell, but did not take the additional second or two to check on Justin.

47. Had he done so, the jailer would have discovered Justin hanging from the cell door in time to potentially save Justin's life.

48. Similarly, when three jailers removed the prisoner from adjacent Cell 127 at 4:19 a.m., not one looked inside Justin's cell. Again, doing so had the potential to save Justin's life.

49. When paramedics arrived and immediately asked how long Justin was hanging, one jailer misleadingly told them "We generally check on them every 15 minutes."

50. The jailer provided that misleading information even though it had been an hour and 15 minutes since anyone checked on Justin.

51. The jailer knew the paramedic was seeking information in order to determine the type of potentially life-saving measures the paramedics would take to try to save Justin, and despite that knowledge provided misleading information.

52. Paramedics transported Justin to the hospital, but it was determined that he was already brain dead. Two days later, Justin died.

53. Justin's death was directly and proximately caused by the acts and omissions detailed above, including the written policies and unwritten practices adopted and enforced with deliberate indifference to the lives and well-being of prisoners in the custody of the Center, that served as the moving force behind the damages claimed by the Estate.

### III.

### STATEMENT OF CLAIMS

#### FIRST CLAIM

**CONDITIONS OF CONFINEMENT
ENTITY CLAIM
DELIBERATE INDIFFERENCE
42 U.S.C. § 1983**

54. Plaintiff hereby adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

55. Authority, Trustees, and/or Gerlock, with deliberate indifference to the lives and well-being of prisoners in their custody, adopted, enforced, ratified, and maintained written policies or unwritten practices at the Center, or alternatively, acquiesced in their use, that caused conditions of confinement that, individually and collectively, served as the moving force behind Justin's death, for which Authority, Trustees, and/or Gerlock are liable to the Estate pursuant to 42 U.S.C. § 1983. The specific conditions include, but are not limited to, use of a dangerous physical plant, inadequate staffing, training, and supervision of staff, and inadequate medical intake procedures.

#### SECOND CLAIM

**INADEQUATE TRAINING
ENTITY CLAIM
DELIBERATE INDIFFERENCE
42 U.S.C. § 1983**

56. Plaintiff hereby adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

57. Authority, Trustees, and/or Gerlock, with deliberate indifference to the lives and well-being of prisoners in their custody, adopted, enforced, ratified, and maintained written

policies or unwritten practices at the Center, or alternatively, acquiesced in their use, that resulted in inadequate training that, individually and collectively, served as the moving force behind Justin's death, for which Authority, Trustees, and/or Gerlock are liable to the Estate pursuant to 42 U.S.C. § 1983. The specific training deficiencies include, but are not limited to failure to provide training to conduct adequate welfare checks, failure to train staff to account of supervisory limitations created by the physical plant when using the segregation cell, failure to train to staff to handle persons experiencing medical and/or psychiatric crises, failure to train to ensure medical staff conducted intake screenings as required by the Oklahoma Jail Standards, and a failure to train to ensure staff documented and logged the activities of segregated persons at risk.

### THIRD CLAIM

### INADEQUATE SUPERVISION
### ENTITY CLAIM
### DELIBERATE INDIFFERENCE
### 42 U.S.C. § 1983

58. Plaintiff hereby adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

59. Authority, Trustees, and/or Gerlock, with deliberate indifference to the lives and well-being of prisoners in their custody, adopted, enforced, ratified, and maintained written policies or unwritten practices at the Center, or alternatively, acquiesced in their use, that resulted in inadequate supervision that, individually and collectively, served as the moving force behind Justin's death, for which Authority, Trustees, and/or Gerlock are liable to the Estate pursuant to 42 U.S.C. § 1983. The specific supervision deficiencies include, but are not limited to use of a dangerous physical plant for segregation purposes, a failure to conduct adequate welfare checks of persons at risk, a failure to supervise medical staff to conduct timely intake screenings as required

by the Oklahoma Jail Standards, and a failure to adequately supervise and monitor segregated persons at risk.

## Fourth Claim

### Supervisory liability
### Individual claim
### Deliberate Indifference
### 42 U.S.C. § 1983

60.  Plaintiff hereby adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

61.  Trustees and/or Gerlock, with deliberate indifference to the lives and well-being of prisoners in their custody, failed to adequately supervise staff at the Center, or alternatively, acquiesced in a lackadaisical approach to operational management that was so lacking in meaningful supervision and discipline that it was the functional equivalent of no supervision at all, and which was the moving force behind Justin's injuries, for which Trustees and/or Gerlock are liable to the Estate pursuant to 42 U.S.C. § 1983. The specific deficiencies supporting supervisory liability include, but are not limited to, the failure to ensure the provision of adequate welfare checks, the failure to ensure the provision of adequate care to persons who are experiencing medical and/or psychiatric crises, the failure to ensure medical staff are conducting timely intake screenings as required by the Oklahoma Jail Standards, a failure to ensure that staff document and log the activities of segregated persons, the failure to discipline staff for excessive and unnecessary use of force, the failure to discipline staff for not conducting sight checks, and the failure to discipline staff for not providing timely intake medical screenings as required by state law.

## FIFTH CLAIM

**EXCESSIVE FORCE
INDIVIDUAL CLAIM
MALICIOUS AND SADISTIC
42 U.S.C. § 1983**

62.   Plaintiff hereby adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

63.   Henneman used force against Justin that was malicious and sadistic and applied for the very purpose of causing harm with no legitimate penological interest when he repeatedly used a TASER in drive stun mode to repeatedly shock Justin for no reason whatsoever even though Justin was handcuffed behind his back, not resisting, and was outnumbered by the six jailers in the elevator. Henneman is liable to the Estate for depriving Justin of his Eighth Amendment rights, actionable pursuant to 42 U.S.C. § 1983.

## SIXTH CLAIM

**EXCESSIVE FORCE/POLICY OR PRACTICE
ENTITY CLAIM
MALICIOUS AND SADISTIC
42 U.S.C. § 1983**

64.   Plaintiff hereby adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

65.   Authority, Trustees, and/or Gerlock, approved the use of force by Henneman against Justin and determined such force was consistent with policy sufficient to support entity liability of the Authority, Trustees, and/or Gerlock for enacting, maintaining and enforcing written policies or unwritten practices that served as the moving force behind the unlawful use of the TASER, for which the Authority, Trustees, and Gerlock are liable to the Estate pursuant to 42 U.S.C. § 1983.

## SEVENTH CLAIM

### EXCESSIVE FORCE/RATIFICATION
### ENTITY CLAIM
### MALICIOUS AND SADISTIC
### 42 U.S.C. § 1983

66. Plaintiff hereby adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

67. Based upon the facts set forth above, Authority, Trustees, and/or Gerlock ratified the use of force by Henneman against Justin and the basis for its use. Upon information and belief, the Authority, Trustees, and/or Gerlock have a history of ratifying excessive TASER use, which motivated and served as the moving force behind the malicious and sadistic use against Justin for which the Authority, Trustees, and/or Gerlock are liable to the Estate pursuant to 42 U.S.C. § 1983.

## EIGHTH CLAIM

### FAILURE TO INTERVENE
### INDIVIDUAL CLAIMS
### DELIBERATE INDIFFERENCE
### 42 U.S.C. § 1983

68. Plaintiff hereby adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

69. The five Doe Defendants in the elevator with Henneman and Justin had actual knowledge that Henneman was using or about to use force against Justin sadistically and maliciously, and despite an opportunity to stop Henneman from using force, or alternatively, to intervene in a meaningful way to prevent the harm or reduce its harmful impact. The five Doe Defendants had sufficient opportunity to intervene given that no force was needed against Justin and the amount of time it took Henneman to unholster his TASER and stun Justin several times. As a direct and proximate result of their inaction, Justin was repeatedly subjected to the TASER

in malicious and sadistic fashion for which the five Doe Defendants are liable to the Estate pursuant to 42 U.S.C. § 1983.

## Ninth Claim

### FAILURE TO PROTECT
### INDIVIDUAL CLAIMS
### DELIBERATE INDIFFERENCE
### 42 U.S.C. § 1983

70. Plaintiff hereby adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

71. John and Janes Does 1-10 had actual knowledge that Justin's condition, or should have had such knowledge, which exposed him to a substantial risk of death or serious harm if left unsupervised, and they further knew that Justin was making affirmative statements that provided actual knowledge that Justin was experiencing a medical and/or psychiatric crisis and at extreme risk of self-harm. Despite that knowledge, and with indifference to the consequences, the John and Janes Does 1-10 took no reasonable steps to alleviate the risk and allowed the state of nature to control, which served as the direct and proximate result of the injuries and damages suffered by the Estate for which John and Janes Does 1-10 are liable pursuant to 42 U.S.C. § 1983.

## IV.

### RELIEF REQUESTED

72. Based on the foregoing, Estate respectfully requests the following relief:

   A. Compensatory damages against all Defendants;

   B. Punitive damages against Defendants sued in their individual capacity;

   C. Punitive damages against the Trustees sued in their official capacities;

   D. Declaratory relief that Defendants acts or omissions deprived Justin of his constitutional rights;

  E. Nominal damages against all Defendants;

D. Reasonable costs and attorney fees;

F. Any other legal or equitable relief to which the Estate is entitled.

**WHEREFORE**, Plaintiff respectfully requests the Court enter judgment in Plaintiff's favor and against all Defendants in amount in excess of $75,000.00.

Respectfully submitted,

BRYAN & TERRILL

By:

Steven J. Terrill, OBA # 20869
J. Spencer Bryan, OBA # 19419
BRYAN & TERRILL LAW, PLLC
3015 E. Skelly Dr., Suite 400
Tulsa, OK 74105
T/F: (918) 935-2777
Email: sjterrill@bryanterrill.com
Email: jsbryan@bryanterrill.com

**ATTORNEY LIEN CLAIMED**
**JURY TRIAL DEMANDED**