```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE
                      WESTERN DISTRICT OF OKLAHOMA
 2

 3    XOUCHI JONATHAN THAO, Special      )
      Administrator for the Estate of    )
 4    KONGCHI JUSTIN THAO,               )
                                         )
 5                    Plaintiff,         )
                                         )
 6                 vs.                   ) Case No. CIV-19-1175-JD
                                         )
 7    GRADY COUNTY CRIMINAL JUSTICE      )
      AUTHORITY, et al,                  )
 8                                       )
                   Defendant.            )
 9                                       )
                                         )
10                                       )
                                         )
11

12

13

14

15

16               DEPOSITION OF A.E. DANIEL

17           TAKEN ON BEHALF OF THE DEFENDANT

18                   JUNE 7, 2023

19

20

21

22

23

24

25
```

LEXITAS

**Exhibit 1**

1       Q    And is that at the court reporter's office?

2       A    I believe so, yes, that is correct.

3       Q    And is the Columbia, Missouri the town where

4   you live?

5       A    Yes.

6       Q    Okay.  And we are all taking this deposition

7   via Zoom to save on cost and things of that nature.  Is

8   everyone in agreement that we can proceed via Zoom?  Is

9   there any opposition at this time?

10          MR. BRYAN:  Not from me.

11          MR. ARTUS:  Particularly from you, Spencer?

12          MR. BRYAN:  No.

13      Q    (By Mr. Artus) Um, Dr. Daniel, would you

14  provide the court reporter your full legal name and you

15  might need to spell your first name?

16      A    AE Daniel, first name is spelled

17  A-n-a-s-s-e-r-i-l.

18      Q    And and you are a medical doctor; is that

19  correct?

20      A    That is correct.

21      Q    I have a copy of your CV, curriculum vitae.

22  Why don't we just get started.  I'm kind of not very good

23  at this Zoom stuff but I think I might be able to do some

24  of this stuff.  I'm going to try anyway.  Bear with me.  Do

25  you have a copy of your report in front of you, sir?

LEXITAS

**Exhibit 1**

1           A     Yes, I do.

2           Q     The report that I have is dated -- if it is

3    dated -- March 13, 2023.  Is that the one you have in front

4    of you?

5           A     That is correct.

6           Q     And the report itself is actually seven pages

7    long but the whole thing including your CV, list of cases

8    you have testified in, and fee schedule makes a total of 27

9    pages.  Does that sound right to you?

10          A     That's sounds right.

11          Q     For the purposes of this deposition, I don't

12   know how the court reporter is going to do this, I am going

13   to share the screen I think.  Can you see this, Doctor?

14          A     Yes, I can see that.

15          Q     And this appears to be the report I was

16   talking about.  If you go to page 8 -- page 7, sorry.  That

17   seems to be the end of the report showing it's dated

18   March 13, 2023.  Do you agree with that?

19          A     That is correct.

20          Q     And does this that I'm scrolling through

21   appear to be the same report that you're looking at right

22   now?

23          A     That is correct.

24          Q     Okay.  And I understand that the report you

25   have has your handwriting on it; is that correct?



**Exhibit 1**

1          A     Yes, I just made some checkmarks.  That's all.

2          Q     Okay.  I would request that the court reporter

3    does get a copy of that as Defendant exhibit in this case.

4    We'll start with six because I think I got five or so to go

5    with.  So can the court reporter do that?

6                MR. BRYAN:  Yes.  She can produce it to us and

7    then we can produce it to you.

8                MR. ARTUS:  No, I want it as part of the

9    transcript.

10               MR. BRYAN:  Then we object.

11         Q     (By Mr. Artus) Where do you have your writing

12   on this report, Doctor?

13         A     Actually I have just put checkmarks, three

14   points.

15         Q     Where did you put your checkmarks on this

16   report?

17         A     On page 6.

18         Q     And I'm now on page 6, where did you put the

19   checkmarks?

20         A     Okay.  That is against second paragraph of

21   Item 7 and second paragraph of Item 8 and the third

22   paragraph of Item 8.

23         Q     Okay.  Where else do you have checkmarks?

24         A     No.  I have underlined three or four phrase

25   against the checkmark.



**Exhibit 1**

```
 1        Q    It's probably better that way.
 2        A    Okay.  I was trained as a psychiatrist in
 3  India at the All India Institute of Mental Health,
 4  Bangalore and I got my diploma in psychological medicine.
 5  Then I immigrated to the United States in 1974 and took my
 6  residency in psychiatry at the University of Missouri in
 7  St. Louis campus.  Later I completed a fellowship in child
 8  adolescence and psychiatry.  Subsequently I was board
 9  certified in adult general psychiatry in 1976.  Then I
10  became board certificate in child adolescence psychiatry in
11  1981.  In the meanwhile I went to England to get board
12  certified in UK.  That is known as membership of the Royal
13  College of Psychiatrist.  Subsequently in 1984 I was
14  certified by the American College of Forensic Psychology.
15  Those are my board certifications.
16        Q    Are they still current?
17        A    Yes, they are current.
18        Q    All of your board certifications that are
19  listed on your resume on page 1 of your resume showing on
20  the screen right now is still current; is that correct?
21        A    Correct.
22             MR. BRYAN:  Andy, you don't have anything
23  showing on the screen at least on mine.
24             MR. ARTUS:  Oh, that's right.  I forgot.
25        Q    (Mr. Artus) Can you see that, Doctor?
```

**Exhibit 1**

1        Q    Is there anything you have reviewed since this

2   time that is not on this list?

3        A    Yes.

4        Q    What are they?

5        A    That's the rebuttal report, the plaintiff

6   report that has been forwarded to me, the three reports.

7        Q    Okay.  So you looked at Dr. Ream's report and

8   Dr. Hough's report and I think there is another expert that

9   Jessica Dark presented for the TASER guy.  I can't remember

10  his name.

11       A    Correct.

12       Q    And so those aren't on this list.  In response

13  you did a rebuttal report for Dr. Reames and Dr. Hough; is

14  that correct?

15       A    That is correct.

16       Q    Did you do any other rebuttal report for any

17  other expert?

18       A    No.

19       Q    Are you holding yourself out as a TASER

20  expert?

21       A    No.

22       Q    As a use of force expert?

23       A    Use of force expert, no.  Even though I have

24  written about use of force in my book.

25       Q    Right.  But that's not how you're holding



**Exhibit 1**

1    yourself out today.  You're not going to be able to talk

2    about or not going to give any opinions as to support

3    Mr. Henneman, I think that's right, used excessive force

4    against Mr. Thao, will you?

5         A    Well, I have, as you know, I have opined that

6    the officers, including Mr. Henneman, should have used a

7    deescalation techniques to calm Mr. Thao down.

8         Q    Do you have any opinion as to whether --

9         A    To that extent I have opined about the use of

10   force.

11        Q    Okay.  But as far as whether or not

12   Mr. Henneman was correct or not in using a taser, you don't

13   have the opinion; is that correct?

14        A    I have no opinion about the techniques or the

15   use of TASER.  I have an opinion --

16        Q    Go ahead?

17        A    As I have indicated in my report, deescalation

18   techniques should have been used to calm him down.  So that

19   means that the use of stun gun should have been avoided.

20        Q    Okay.  We'll follow up with that and I'm sure

21   Jessica Dark will too.  Let's go back to your report.  We

22   talked about you have reviewed the defendant's expert

23   report and then you have done your own rebuttal about Dr.

24   Reames and Dr. Hough.  You have testified about that,

25   correct?

```
 1            MR. ARTUS:  You can coach him all you want.
 2   The video will speak for itself.
 3            Q    (By Mr. Artus)  Did you understand the
 4   question, Doctor, or do you need me to repeat it?
 5            A    I do.  The referral to mental health person
 6   depends upon the totality of circumstances.  So you have to
 7   look at what he has been doing during the time when the
 8   officers were handling him.  So at precisely -- if you ask
 9   at that point does he require a mental health evaluation,
10   the answer is maybe, who knows.
11            Q    Right.  Okay.  So was it appropriate for the
12   officer to take him down to the ground when Mr. Thao
13   attempted to run out the door?
14            A    I don't know, you know, if that would have
15   been appropriate procedure.  My testimony is they should
16   have asked him what is going on with him.  He was not --
17            Q    So when he was --
18            A    He was not threatening anybody.
19            Q    Okay.  So it's not threatening to run out the
20   door of your prison cell.  That would be -- so they should
21   have just let him run out and then kind of done what?
22            MR. BRYAN:  Object to form.
23            Q    (By Mr. Artus) Tracked him down and then asked
24   him what he was doing?
25            MR. BRYAN:  Object to form; argumentative.
```



**Exhibit 1**

1          A     I'm not saying they should let him run out.

2   Basically they should have basically intervened and stopped

3   him but not to throw him down to the floor and overpower

4   him.  That has set in the motion -- set in motion his,

5   basically his frustration.  His difficulty to handle the

6   confinement at the time.  So what the officer should have

7   done is to basically, you know, not to throw him on the

8   floor but to basically physically stopped him in his way

9   and then asked him questions and tried to deescalate the

10  condition.

11         Q     (By Mr. Artus) And of course the people who

12  are up on the floor is a female nurse and female guard and

13  one male guard.  You're saying those three people should

14  have -- should not have tried to put him on the ground,

15  correct?

16         A     Putting on the ground was done by the officer

17  who came a few minutes later.

18         Q     So did you not see that he was taken to the

19  ground immediately after he rushed out the door?

20         A     I think the call for help and other officers

21  came in and they put him down.

22         Q     Okay.  How should they have deescalated?  How

23  do you deescalate someone who is kicking at you and

24  fighting you?

25         A     I think he didn't kick at anybody, did he?

**Exhibit 1**

1          Q    Okay.  So how should they deescalate?

2          A    Deescalation should be simply asking

3    questions, what bothers you?  Why you are attempting to

4    leave the situation?  Just tone him down and then he would

5    have -- he was a 20 year old young fellow.  He was not

6    threatening anybody.

7          Q    So you think that they should have just talked

8    to him and he would have calmed down?

9          A    Well, if that didn't work then of course you

10   go to the next step of taking him down or whatever you want

11   to do.  The point is immediately he was thrown to the

12   ground.

13         Q    Okay.  And so any other deescalation

14   techniques that should have been done?

15         A    Well, the officer should be -- should have

16   been trained to do the deescalation.  That's a technique

17   they use in most of these situations.  Essentially meaning

18   that, you know, take the situation a notch down, calm him

19   down.  If still he continues to leave or even personally

20   threaten one of the officers, which he didn't, and then

21   should have been -- then you go to the next level of using

22   the force.

23         Q    At what point in time did Mr. Thao become

24   suicidal in your opinion?

25         A    I can't precisely say at what point but

**Exhibit 1**

1          Q     Did you say you can or cannot?

2          A     I can, c-a-n.

3          Q     Okay.  But you think they would just be wrong

4    if they thought that?

5          A     I don't make any judgment whether it's wrong

6    or right.

7          Q     When Mr. Thao was put in cell 126 in your

8    opinion was he suicidal at that point in time?

9          A     Most likely.

10         Q     And how do you come to that conclusion?

11         A     Because he continues to show behavioral

12   changes and he was making statements that asking the

13   officer to kill him and that he was going to kill himself.

14   He was yelling and screaming and making all kinds of noise,

15   making loud statements, and making a statement to the

16   effect that "I am done with you all."  Similar statements

17   indicating that he was most likely extremely frustrated and

18   he was finding no way out, so that was the time he became

19   acutely suicidal.

20         Q     Did that happen at the moment he was placed in

21   cell 126?

22         A     As I said earlier, I cannot precisely say

23   which moment it happened.  It happened through the process

24   while he was being taken down and applied stun gun and

25   carried to cell 126 and while he was in the cell.

1   that Mr. Thao was in an acute mental health crisis.  I

2   think we have talked about that.  What is your basis that

3   he was in an acute mental health crisis?

4           A    Okay.  Basically he, as I said, he was trying

5   to escape the jail.  He was showing behavioral changes

6   while in the jail.  As I mentioned, somebody is interfering

7   into our conversation here.

8           Q    You mean on the Zoom?

9                COURT REPORTER:  There is some feedback we are

10  picking up on somebody's audio.

11          Q    (By Mr. Artus) So we were talking about your

12  Opinion No. 1 and why he was in an acute mental crisis and

13  you said it was because he was trying to escape and you're

14  saying his behavioral change?

15          A    Yes.  Basically his behavioral change.  Then

16  it was while he was in cell 126 he was showing agitation,

17  evidence of frustration, screaming and making loud

18  statements.  Then he was making statements of being killed

19  by the officers or having to be killed by the officers and

20  making direct statements of suicide.  So all of these

21  things taken together, he was in acute mental health

22  crisis.  Looking back we know.

23          Q    You're saying a reasonable jailor should have

24  recognized that?

25          A    Yes.

Exhibit 1

1          Q    And he was just going to spend the night and

2    then get on the plane and then go over to California to the

3    prison there, right?

4               MR. BRYAN:  Object to form.

5          A    That's my understanding right.

6          Q    (By Mr. Artus) Right.  So but you said he was

7    agitated and scared that he would not be able to go to

8    California, right?

9          A    Correct.

10         Q    And then you said he became more frightened

11   when he was subdued and the TASER was applied to him?

12         A    Correct.

13         Q    And the officer did not try to use

14   deescalation techniques to calm down; is that right?

15         A    Correct.

16         Q    We talked about that?

17         A    Right.  Yes.

18         Q    And you're saying when he was resisting and

19   fighting they should have just talked to him instead of

20   using hands on him or a TASER, right?

21              MR. BRYAN:  Object to form; assumes facts not

22   in evidence.

23         A    No, what I have testified earlier and continue

24   to testify that they would have used a deescalation

25   technique to calm him down before applying the stun gun on

LEXITAS

**Exhibit 1**

1  him.

2       Q   (By Mr. Artus) Okay.  Do you agree that

3  sometimes you have to act in the moment?  You have to make

4  split second decisions and you have to react?  When

5  somebody is charging at you, you have to react in a second.

6  You don't have time to think about I should just stand back

7  and talk.  Do you agree that's something that is very

8  common that happens?

9       MR. BRYAN:  Object to form.

10      A   Those situations do happen.  Then that's a

11  situation where they think they are putting other people in

12  danger having a gun or making direct statements of, you

13  know, threats and killing others.

14      Q   (By Mr. Artus) All right.  If somebody -- if

15  I'm a jailor and an inmate comes running at me, my adrenal

16  goes up.  I react.  I got to say it's not going to be my

17  first thing to do is say I want to talk to him.  I'm going

18  to try to get him subdued so I don't get harmed and someone

19  else doesn't get harmed.  Is that appropriate?

20      MR. BRYAN:  Object to form, assumes facts not

21  in evidence,; argumentative.

22      A   He was not running at them.  Even he was not

23  running at the nurse.  He was running past.  He was about

24  to run past the nurse.

25      Q   (By Mr. Artus) Okay.  So they could have just

**Exhibit 1**

```
 1   let him run past him?
 2            MR. BRYAN:  Object to form; argumentative.
 3        Q    (By Mr. Artus) Is that what you're saying?
 4        A    I'm not saying that.  Basically he could have
 5   been, you know, cornered off and talked to him rather than
 6   immediately applying stun gun.
 7        Q    Okay.  Have we talked about the deescalation
 8   that should have been done?  Is there anything else that
 9   you want to add to that?
10        A    No.
11        Q    You say in Opinion No. 3 that in cell 26 he
12   stated that he was going to commit suicide.  Do you have
13   any evidence that any officer heard what the plaintiff was
14   saying?
15        A    He did not make any direct specific statement
16   to an officer.
17        Q    Okay.  So Mr. Thao did not make any direct
18   statement to an officer that he was going to commit
19   suicide; you agree with that?
20        A    Did not make any personal statement to an
21   officer, correct.
22        Q    Right.  So then it was up to the officer just
23   to overhear what he was saying, right?
24            MR. BRYAN:  Object to form.
25        A    The officers should have heard his continued
```



**Exhibit 1**

1  he failed to do so because.

2       Q    And if he did that -- if he thought that, then

3  that would be in violation of policy?

4       A    If he thought what?

5       Q    If he thought that he, Mr. Thao, needed to be

6  seen by a nurse and didn't do it, that would be a violation

7  of policy, right?

8       A    Right.  That's correct.

9       Q    No. 7 you say the officers were grossly

10 indifferent.  What does that mean, grossly indifferent?

11      A    They disregarded substantially the serious

12 medical need, which is a suicide risk, that Mr. Thao was

13 demonstrating at the time he was in Grady County Jail.  So

14 they filed to recognize the serious suicide risk, failed to

15 take appropriate action, and that was gross disregard or

16 indifference to his medical need.

17      Q    And then with regard to the Oklahoma Jail

18 Standard, you said they stipulate medical triage screening.

19 That's the part you underlined, right?

20      A    Correct.

21      Q    And is it your opinion that the fed screening

22 prior to transport isn't good enough?

23      A    I didn't hear you.  Can you repeat that?

24      Q    Is it your opinion that the medical -- that

25 the screening that the federal, Feds, the Marshal's

LEXITAS

**Exhibit 1**

1  that was provided to jailors at the Grady County Jail?

2        A    Well, we talked about the slides and the power

3  point presentation that I reviewed.

4        Q    And there was nothing wrong with that, right?

5             MR. BRYAN:  Object to form.

6        A    Again, you know that I don't agree with the

7  characterization of "nothing wrong."  That's not the way I,

8  as an expert, look at these situations.

9        Q    (By Mr. Artus) Well, the power point slides

10 were helpful -- would you agree they are helpful in

11 pointing out what suicide risks are and how to identify

12 them?

13            MR. BRYAN:  Object to form.

14       A    Yes, to some extent.  They are not complete

15 but they point out to the risk factors and situations where

16 an inmate could be identified as a suicide risk.

17       Q    (By Mr. Artus) Are you aware of any prior

18 suicides that occurred at the Grady County jail other than

19 Mr. Thao?

20       A    No, I have not done an analysis of the prior

21 suicide attempts or suicides in Grady County Jail.

22       Q    Are you going to be able to testify about

23 there being a pattern or series of suicides that occurred

24 that should have put the jail on notice of problems in

25 their training?



**Exhibit 1**

1          Q      (By Mr. Artus) Did you know that the jail had

2    been inspected just a few days before this incident and had

3    been found in compliance of no deficient practices?

4          A      No.

5          Q      Okay.  You find that the Grady County Justice

6    Authority were grossly indifferent to Mr. Thao's needs.  As

7    I understand it, it's your opinion that the -- is that what

8    you're finding?

9          A      Yes.

10         Q      But what percentage of fault do you put on

11   Mr. Thao for committing suicide?  I mean, he is the one

12   that did it?

13               MR. BRYAN:  Object to form; negligence is not

14   an issue in these types of cases.

15         Q      (By Mr. Artus) Does Mr. Thao have any fault in

16   this?

17         A      My response --

18         Q      Doctor?

19         A      I'm thinking you see.  My response to that

20   question is the jail has the responsibility to protect him

21   from self-harm.  Their responsibility is to identify,

22   recognize a suicide risk and take appropriate action.  In

23   that context, it is totally 100 percent responsibility of

24   the staff to follow proper procedures and practice.

25         Q      I think I asked this already but who do you

LEXITAS

**Exhibit 1**

1    think, what jailor or person do you feel was deliberately

2    indifferent to Mr. Thao?

3              MR. BRYAN:  Objection; asked and answered.

4         A    All officers who were on duty that particular

5    night at Grady County Jail.

6         Q    (By Mr. Artus) Okay.  What policy or practice

7    do you believe was so woefully bad that it rose to the

8    level of deliberate indifference?

9         A    Well, the policy --

10             MR. BRYAN:  Objection; it calls for a legal

11   conclusion.

12        A    From a psychiatric point, the policies are

13   okay or were appropriate but the implementation, as I have

14   noted in my report, was the main problem here.

15        Q    (By Mr. Artus) And that would be a lack of

16   training, correct?

17        A    Lack of training and lack of action by the

18   officers.

19        Q    Okay.  Do you agree though that if a jailor

20   recognized that Mr. Thao was suicidal and then failed to do

21   anything about it, that would be against the policies;

22   would you agree with that?

23        A    If the jailor has recognized and failed to do

24   anything to mitigate that suicide risk, that would be

25   considered the basis for gross disregard of the serious

LEXITAS

Exhibit 1

1  that?

2        A    Yes.

3        Q    You testified earlier that you did not believe

4  the officer needed to use the TASER in this situation,

5  correct?

6        A    Correct.

7        Q    And you stated that the officer or the other

8  officers they should have engaged in some different

9  deescalation techniques instead, correct?

10        A    Correct.

11        Q    Are those two opinions essentially the sum

12  total of your opinions about Mr. Henneman's conduct in this

13  case?

14        A    Yes.

15        Q    Okay.  And do you agree that you have not

16  reviewed his deposition, correct?

17        A    Correct, yet.

18        Q    Do you intend to review it?

19        A    I leave the opportunity open for me to review

20  it.  If additional supplemental reports is to be requested,

21  I will do so.

22        Q    Okay.  You testified that you are not going to

23  give any opinion as to the technique of the use of the

24  TASER, correct?

25        A    Correct.



**Exhibit 1**

1        Q    Other than what we have talked about, are you

2   going to make any sort of opinion that the use of the TASER

3   from a law enforcement perspective, was reasonable or not?

4        A    That is correct.

5        Q    Did you conduct any sort of psychiatric

6   evaluation of Mr. Henneman's state of mind when he used the

7   TASER?

8        A    No.

9        Q    Did you evaluate Mr. Henneman's intent when he

10  used the TASER?

11       A    No, I have not.

12       Q    Do you know what Mr. Henneman's responsibility

13  and duties were in the jail on this night?

14       A    As of now, I do not.  I think the deposition

15  may show that.

16       Q    Okay.  And I will tell you that Mr. Henneman

17  was the transport officer that night.  Do you understand

18  that he had no responsibility for conducting any of the

19  site checks on Mr. Thao that night?

20       A    If he was the transport officer then he did

21  not have any responsibility to do site monitoring.

22       Q    Okay.  And you agree that as the transport

23  officer, he was not the booking officer.  He wasn't the

24  officer sitting in that booking area near the cell, right?

25       A    Correct.

LEXITAS

**Exhibit 1**

1          Q     Have you seen any evidence in the record in

2    anything that you reviewed that Mr. Henneman himself heard

3    any of the comments made by Mr. Thao while he was in the

4    cell?

5          A     Not that I'm aware of.

6          Q     When we look at the report and went through

7    Opinions 3-9 there were references to officers just kind of

8    in a general view.  I just want to confirm that you were

9    not referring to Officer Henneman in any of those opinions,

10   correct?

11         A     Well, except in so far as he did not

12   participate in any sort of deescalation technique or

13   procedures to calm Mr. Thao down.

14         Q     So once Mr. Henneman assisted in placing

15   Mr. Thao in the cell, you have no further opinion as to his

16   interaction or knowledge with regard to Mr. Thao, correct?

17         A     Correct.

18         Q     Have you ever worked as a detention officer?

19         A     No.

20         Q     Have you worked as a law enforcement officer

21   in any way?

22         A     No.

23         Q     Do you hold yourself out as an expert in law

24   enforcement procedures?

25         A     I have opined on correctional practices

```
 1   because of my long term association with the Department of
 2   Corrections and working in jails, and having consulted on
 3   numerous cases across the country.  Even though I'm not a
 4   correctional officer, I can opine on correctional practices
 5   as it applies to the procedures and practice of suicidal
 6   inmates.
 7         Q    Okay.  So your experience and your
 8   qualifications are to the extent that the policies and
 9   procedures relate to medical or mental health care for
10   inmates, correct?
11         A    Correct.
12         Q    And correctional practices, yes?
13         A    Yes.
14         Q    And you don't have any experience or
15   qualifications in opining as to use of force policies in
16   correction facilities, correct?
17         A    I have experience.  I have opined on a couple
18   of cases in a couple of lawsuits involving use of force on
19   mentally ill persons.  I have two cases I have testified.
20         Q    Have you ever been trained on how to use a
21   TASER?
22         A    No.
23         Q    Have you ever been certified to use a TASER?
24         A    Say that question again.
25         Q    Have you ever been certified on how to use a
```



**Exhibit 1**

```
 1  TASER?

 2         A    No.

 3         Q    Do you own a TASER?

 4         A    No.

 5         Q    Have you been tased?

 6         A    No.

 7         Q    You agree with me that you are not an expert

 8  in the proper use of a TASER?

 9         A    Correct.

10         Q    Do you understand that there are two methods

11  in which a TASER can be used?

12         A    I read about it but I don't have any opinion

13  on the proper way of using a TASER.

14         Q    In your preparation for this report and your

15  opinion, did you review any medical literature regarding

16  the use of a TASER in a jailor or prison setting?

17         A    No, I have not.

18         Q    Have you reviewed any medical literature

19  regarding the utility of a TASER?

20         A    No.

21         Q    Did you review any medical literature

22  regarding the decreased likelihood of serious injury to a

23  subject when a TASER is used?

24              MR. BRYAN:  Object to form.

25         A    I have not reviewed any medical literature on
```



**Exhibit 1**

1  that but I am aware of the point you are making.

2         Q    (By Ms. Dark) Do you agree that you are not an

3  expert in the use of intermediate force by a defense

4  office?

5         A    No.

6         Q    You agree that you are not an expert on the

7  hands-on use of force on an inmate?

8         A    No, I am not.

9         Q    I'm sorry, I'm asking it confusingly.  You do

10  agree with me, correct?

11         A    Yes.

12         Q    And you agree that you are not an expert in

13  the deescalation techniques in a prison or jail setting?

14             MR. BRYAN:  Object to form.

15         A    I know enough about the indications and the

16  procedures of deescalation techniques, which I have written

17  in my book.

18         Q    (By Ms. Dark) Which book is this?

19         A    The book I have written titled "Suicide in

20  Jails and Prisons, Preventive and Legal Perspectives."

21         Q    Does any of your experience or book writing

22  conclude that there is a tie or a link between being tased

23  and a subsequent suicide attempt?

24             MR. BRYAN:  Objection; outside of the scope.

25         A    No.

LEXITAS

**Exhibit 1**

1          Q     (By Ms. Dark) Did you perform any evaluation

2    of Mr. Henneman's use of the TASER under the Graham versus

3    Connor Standard?

4          A     No.

5          Q     Did you perform an evaluation of

6    Mr. Henneman's use of force under the Kingsley Standard?

7          A     No.

8          Q     Do you know what either of those legal

9    standards are or is I guess?

10         A     I read about it but I have not studied them.

11         Q     And you can't say with a reasonable degree of

12   certainty that any further deescalation techniques or

13   talking to Mr. Thao would have been fruitful or not,

14   correct?

15              MR. BRYAN:  Object to form.

16         A     The outcome of deescalation technique, you

17   know, I have no opinion on the outcome.  My opinion is that

18   should have been tried before stun gun was used.  That was

19   the only opinion I have.

20         Q     (By Ms. Dark) You agree that the feelings of

21   pain are subjective to each person?

22         A     You are asking a physician that question?

23         Q     Yes.

24         A     Yes.

25         Q     You agree?



**Exhibit 1**

A.E. Daniel                                                Pages 114

1          A     The answer is obvious.

2          Q     Right.  You agree that it would be impossible

3    for one person, like you, to say exactly what kind or what

4    level of pain someone else, like Mr. Thao, would have felt

5    when he had been tased?

6          A     There is no way to determine because the pain

7    is a subjective sensation.  It depends upon various

8    variables.  You know, for example if somebody has pain in

9    the legs due to peripheral neuropathy and the person is

10   suffering from acute chest pain, the pain in the legs is

11   not a problem.  He's more concerned and perceives the chest

12   pain more acutely.  So it depends upon the circumstances.

13   Depends upon number of variables.

14         Q     You're not going to offer an opinion to the

15   jury that you know with a reasonable degree of certainty

16   that Mr. Thao felt pain when he was tased, right?

17         A     That's correct.

18         Q     And you're not going to opine whether

19   Mr. Henneman's decision to use the TASER was appropriate

20   according to the training he had received?

21         A     Correct.

22         Q     You're not offering any opinion that a single

23   tase caused Mr. Thao to commit suicide, correct?

24         A     That's correct.

25         Q     Have you ever had any of your expert opinions



**Exhibit 1**

```
 1   occurrences of similar events in a jail.  That is the
 2   typical definition of psychological autopsy.
 3            Q    And that's what you did here?
 4            A    Um, to the extent that this was a
 5   consultation, even though I was not part of the jail, this
 6   was somewhat similar to that process.
 7            Q    Do you agree that when you're trying to
 8   determine what caused a suicide, the more information you
 9   have, the more accurate the results you can get?
10                 MR. BRYAN:  Object to form.
11            A    Sometimes more information would be helpful;
12   sometimes whatever information we have might be adequate to
13   provide that opinion.
14            Q    (By Ms. Dark) Did you attempt any interview
15   with any of Justin Thao's family?
16            A    No, I didn't.
17            Q    Did you review any of his past medical or
18   psychological records?
19            A    No.
20            Q    Did you attempt to determine what previous
21   psychiatric diagnoses he may have had?
22            A    I have not.
23            Q    Did you review his juvenile history, like
24   psychiatric records and criminal records or anything like
25   that?
```

LEXITAS

**Exhibit 1**

1          A    No, I have not.

2          Q    And you didn't personally inspect the scene,

3    correct?

4          A    No, I have not.

5          Q    Did you review any of Mr. Thao's writings or

6    journals?

7          A    No, I have not.

8          Q    Did you review any of his social media or

9    communication with his family?

10         A    No, I have not.

11         Q    Have you asked to look at any of this?

12         A    No, I have not.

13         Q    Did you review any of his arrest reports or

14   criminal records from the charges that he was in the jail

15   on at this point?

16         A    No, I have not.

17         Q    Did you review any of this school records?

18         A    No, no.

19         Q    Did you review whether he was in any

20   special-education classes or had an IEP?

21         A    No.

22         Q    Did you explore whether there was a history of

23   suicide in his family?

24         A    I don't have information but if I have those

25   information that would be very helpful to my opinions in

LEXITAS

**Exhibit 1**

1    this case.

2        Q    Did you attempt to evaluate any of the

3    relationships he had with any of his peers?

4        A    No, I have not.

5        Q    Were you aware that when he was arrested he

6    had 50 pounds of marijuana in his possession?

7        A    I was not.

8        Q    Then I'm assuming you didn't evaluate whether

9    he might be in trouble with any sort of drug cartel or

10   someone for having had that marijuana confiscated?

11       A    Well, that information would have been helpful

12   to bolster my opinion further.

13       Q    Because more information, the better, right?

14            MR. BRYAN:  Objection; misstates his

15   testimony.

16       A    I already testified sometimes more information

17   is helpful; sometimes not.

18       Q    (By Ms. Dark) Did you evaluate if he had any

19   sort of gang activity?

20       A    No, I have not.

21       Q    Did you evaluate his financial condition?

22       A    No.

23       Q    Did you evaluate if he had been involved in

24   any prior traumatic incidents or events?

25       A    No, I have not.

LEXITAS

**Exhibit 1**

1        Q     Do you know if there was a family history of

2    mental illness?

3        A     That would be helpful to know.

4        Q     Do you know if there was a family history of

5    substance abuse?

6        A     Again, that would be helpful to know.

7        Q     Did you know that prior medical providers of

8    Mr. Thao had determined he had chronic substance abuse

9    before he went into the jail?

10        A     That I can imagine he could have but, again, I

11    have not evaluated that point.

12        Q     Do you agree with me that all of these and

13    more things could be relevant if your were tyring to do a

14    complete psychiatric autopsy?

15               MR. BRYAN:  Object to form; outside of the

16    scope.

17        A     Yes.  The information would be helpful but the

18    point I have already made here, the Grady County Justice

19    Authority did not do any screening.  They have

20    responsibility to identify any of the factors that you have

21    mentioned.  So that's the more significant point here.

22        Q     (By Ms. Dark) Well, he was in their custody

23    for just a few hours but you wrote this report over the

24    course of several months, right?

25        A     That doesn't absolve the jail's responsibility

LEXITAS

**Exhibit 1**