# DANIEL FORENSIC PSYCHIATRIC SERVICES

33 East Broadway, Suite 115
Columbia, MO 65203
Telephone: (573) 443-6930  Fax: (573) 875-4272
aedaniel@aol.com
www.prisonsuicideexpertwitness.com

## PROFESSIONAL OPINIONS

Regarding:   In the United States District Court for the Western District of Oklahoma
Xouchi Jonathan Thao v. Grady County Criminal Justice Authority et. al.

This is a report of my professional opinions and conclusions regarding the above-titled matter by Rule 26(a) (2) (B) of the Federal Rules of Civil Procedure prepared at the request of Glenn Katon, an attorney at law from Oakland, California, who represents the plaintiff.

My opinions and conclusions are based on a review of records provided to me and my experience, training, and expertise, which are briefly outlined below, and the details are included in the attached Curriculum Vitae. Professional Opinions and Conclusions are provided to a reasonable degree of medical and professional certainty.

Qualifications:

I, A. E. Daniel, M.D., am a physician specializing in psychiatry and licensed to practice medicine in Missouri. I am certified in Adult General Psychiatry by the American Board of Psychiatry and Neurology. In addition, I have significant clinical, forensic, academic, and administrative experience in correctional mental health and psychiatry.

I have authored and co-authored several peer-reviewed articles in correctional mental health, particularly on risk identification, prevention, and risk management strategies relating to suicide in jails and prisons. Specifically, I am one of the co-authors who updated the World Health Organization Resource Guide to Suicide in Jails and Prisons.

I have conducted seminars and in-service training on suicide prevention and interventional strategies for mental health staff working in prisons and jails.

I was the Director of Psychiatric Services by contract for the Missouri Department of Corrections between 2001 and 2007. In this position, I directed, managed, and supervised services provided by psychiatrists working in all prisons in Missouri. During this period, I was administratively responsible for all mental health services the mental health staff provided. Additionally, I have significant experience interacting with correctional staff that provides direct one-to-one services to inmates on suicide watch and attending to their needs.

I have considerable experience in providing direct psychiatric services to jail and prison inmates in various correctional institutions.

I have studied, analyzed, and published risk factors and profiles of over 37 inmates who committed suicide.   Also, I reviewed the profile of 80 other prisoners who committed suicide or made near-lethal suicide attempts during my clinical and expert consultative work. As a medical director and administrator, I have participated in numerous mortality and morbidity reviews and debriefing conferences in which medical, mental health, and jail and prison staff participated.

**Exhibit 3**

I have also trained medical, mental health, and jail staff regarding risk factors, prevention strategies, appropriate medical, mental health, and correctional policies and implementation of such policies, officers' responsibilities and duties, and their pivotal frontline role in preventing suicide in jails and prisons. Through my research, clinical, administrative experience, and expertise, I have established myself as an expert in suicide in jails and prisons.

Documents Reviewed:

| FILE NAME | DESCRIPTION |
| --- | --- |
| DUNCAN DEPO TR (Folder) | Deposition transcript and exhibits for jailer who was on duty and interacted with Justin |
| GCLEC Production Video Photo (Folder) | Video files that include audio for the period Justin was in Cell 126 (isolation cell) |
| JAIL VIDEOS SHARE PROTECTIVE ORDER (Folder) | Videos files chronological by file name for the entire time Justin was at the jail |
| 1 Petition - Thao | Complaint filed in court |
| Audio Transcript | The transcript prepared by an audio expert of discernible audio while Justin was in the isolation cell |
| DDR 1, 001-018 | Lab rep from two days after the incident; photos of jail and cell the night of the incident, photos of Justin on life support |
| DDR 2, 001-075_Redacted | GCLEC book in records, federal forms re transit, jailer incident reports, long list of inmates |
| DDR 3, 1-37 | Records of Shelly Elliot's death in 2015 in cell 127 |
| DDR 6, 1-52 | GCCJA Policy and Procedure Manual |
| DDR 9, 001 Layout | Jail first floor layout which includes cell 126 |
| DDR 16, 001-014 | GCCJA contract with USMS; 008 "Inmates who are hostile, violently or who demonstrate unusual or bizarre behavior receive more frequent observation" |
| DDR 17, 001-011 | Contract for medical services at the jail |
| DDR 24, 001-025 | USMS guidance, facility info, policies re PREA |
| DDR 24, 026-037 | USMS detention facility review |
| DDR 54, 001-007 | Cell file for 126 nights of the incident; the log of cell assignments |
| DDR 60, 001-097 | Powerpoint "MENTAL HEALTH AND THE UNITED STATES PRISON SYSTEM" |

**Exhibit 3**

| DDR 66, 001 | GCCJA org chart |
|---|---|
| DDR 67, 001-004 | Measurement of towel |
| Depo Tr. Johnnie Farley | Deposition of shift supervisor at the jail on the night of the incident |
| GMH 001-049 Grady Memorial Hospital recs | Records from the hospital where Justin died |
| SAMC 001-074 St. Agnes Med Center recs | Records of a car crash in Aug 2015 |
| Okla. Administrative Code 310:670 | Standards For Jail Facilities/Detention Center (in effect at the time of the incident) |
| American Correctional Association Standards for Adult Local Detention Facilities | 4-ALDF 2A-52, et seq. |

Incident Summary:

Kongchi Justin Thao (DOB 9/2/1997), a 20-year-old male, was housed at the Grady County Justice Authority (Jail) on November 15, 2017. He arrived at the Jail on November 15, 2017, at 6.00 p.m., to be housed for a night in transit to California to complete a one-year sentence arising from the possession of marijuana.

Mr. Thao attempted suicide in cell 126 at the Jail on the night of November 15/16, 2017, using a towel anchored to the door handle inside the cell.

Mr. Thao was found hanging at 4:20 a.m. on November 16, 2017. He was unresponsive at the time. Transport Officer Duncan began CPR, and Sergeant Farley continued the CPR. He was found to have a pulse, and around 4:29 a.m., he was transported to Grady County Memorial Hospital, where he died of anoxic brain injury and cardiopulmonary arrest on November 18, 2017.

The Prisoner in Transit Summary from the US Marshal's Service, dated November 13, 2017, shows that he was cleared for travel. Except for a Tuberculosis test result, there were no entries about his medical and mental health.

Jail's Account:

The incident report shows that Mr. Thao was placed on the fourth floor after his arrival at the Jail. Around 0239 hours on November 16, 2017, when nurse Grey arrived at the pod to dispense medication, Mr. Thao "appeared to rush" toward Nurse Grey and the officer standing at the open door. Officer Harrison explained to Sergeant Farley that "Mr. Thao started charging the door where the nurse was standing." Officer Harrison handcuffed and took Mr. Thao to the elevator to place him in a cell on the first floor in preparation for his transport to the airport. Mr. Thao "resisted" the move, and as other officers arrived, Officer Henneman discharged his

**Exhibit 3**

TASER stun gun to Mr. Thao's thigh. He was escorted to cell 126 on the first floor at 0241 hours. The incident report further shows that at 0307 hours, an officer checked on him.

Transport Officer Duncan testified that he was with Mr. Henneman when they heard a call "for all available officers." They went to the fourth floor, where Mr. Thao was being handcuffed. He was combative and screaming. Officer Henneman applied the TASER. Officers picked him up and took him to cell 126.

The incident report further showed that a female prisoner in cell 127 demanded that Mr. Thao be moved away from her cell. Officer Henneman reportedly heard the loud, somewhat obnoxious yelling by the female inmate that Mr. Thao be moved away from the cell next to her (127).

Cell 126, a segregated cell, was previously used as a shower cell for inmates in administrative segregation. It had no camera and no furniture. Instead, there was a "concrete" seat inside the cell. Its door had a flap, which remained fully closed unless an officer lifted it.

At 0253 hours, Mr. Thao asked for a towel, which was given to him.

Around 0420 hours, Transport Officer Duncan asked Officer Henneman to prepare Mr. Thao for transport. Mr. Henneman asked the control room to open cell 126. As he could not open the door, he forced himself into the cell to find that Mr. Thao was hanging from the door handle, with the towel around his neck anchored to the door handle inside the cell.

Other Evidence:

The Oklahoma State Department of Health notified the Jail in 2016 of a violation of the state regulation on visual sight checks of isolation cell 127 and provided that "It is recommended that jail administrator ensures that jail staff conducts at least one sight check every hour that includes all areas of each cell and document each check in accordance with jail standards." (DDR #3).

Corporal Duncan testified at deposition that he had not had training on how to identify mental health issues in prisoners in approximately ten years, had never been tested on how to deal with mental health issues of prisoners, and did not recall ever receiving any training on the subject of mental health issues in prisoners other than some limited signs of what to look for. (Transcript 44-45.)

Johnnie Farley, a former detention officer at the Jail and shift supervisor the night of the incident, testified at deposition that although he received training on how to respond if a prisoner expressly stated an intention to commit suicide, he did not receive training on how to respond to other indications of a possible mental health crisis such as "I want to die. I just want to die." (Transcript 178-80.) He also testified that he had not received training on how to respond to other serious mental health episodes such as a prisoner yelling at themselves or scratching themselves like they had bugs on them and no training on how to identify if a prisoner may be under the influence of drugs. (Transcript 101-02.)

**Exhibit 3**

Audio from Video Recording:

The audio recording from Cell 126 between 0241 hours and 0438 hours shows that Mr. Thao stated that he was not rushing at the nurse but was trying to run out of the room. At 0243 hours, he became more agitated, scared, and fearful, asking for help and asking the officers to kill him.

At 0251 hours, Mr. Thao was heard saying, "You said they were gonna kill me" and "You said they would kill me and do all these other things."

At 0254 hours, an officer was heard saying, "I might need him to see a nurse."

At 0307, the door to cell 126 was closed with Mr. Thao inside.

At 0311 hours, jail staff was heard through a speaker saying, "He's pretty good. He's keeps talking about, will be a dead man."

At 0324 hours, Mr. Thao was heard saying, "Stop. I'm gonna fucking commit suicide. Stop doing this."

At 0326 hours, he was heard saying, "And I might as well kill myself."

At 0339 hours, he was heard saying, "I am ready to die; come and kill me, so do it."

At 0409 hours, he was heard saying, "I am done with all of y'all."

Throughout the audio recording, Mr. Thao repeatedly stated he feared for his life, "come and kill me. I am ready to die," and other indications he was in an acute mental health crisis.

Records from Grady Memorial Hospital:

The records show that he was transported to the hospital in an unresponsive state. His urine amphetamine screen was positive (November 16, 2017, 5:27 a.m.).

Opinions:

Based on the available records forwarded to me, I opine with a reasonable degree of medical and professional certainty that:

1.   Kongchi Justin Thao was in an acute mental health crisis on November 15, 2017, after he was placed on the fourth floor. He was out of contact with reality, trying to escape jail. His mental health crisis continued as he was taken to the elevator and when he was in Cell 126.

2.   Mr. Thao was agitated, scared, and fearful that he would not be allowed to go to California. He became more frightened as the officers subdued him and applied the TASER stun gun. If they felt he was aggressive toward the staff, the officers did not try to use any de-escalation technique to calm him down.

5

**Exhibit 3**

3. In cell 126, he stated he was going to commit suicide. Furthermore, he repeatedly asked the officers to kill him, stating that he wanted to die and was ready to die.

4. The officers gave Mr. Thao, who was in a mental health crisis and suicidal, a towel sufficiently long enough to be used for a hanging ligature. In addition, the inside door handle of the cell with a closed bottom "U" shape presented a tie-off risk for hanging.

5. Mr. Thao was not adequately monitored while he was in Cell 126. He was left unattended between 0307 and 0421 hours on November 16, 2017. Hourly monitoring of detainees in a segregated cell is the bare minimum standard, which the Jail failed to meet here. In addition, Mr. Thao required more frequent monitoring as he was in a mental health crisis and expressed suicided ideation. However, no logs indicating that he was monitored on a regular basis were available.

6. Although an officer was heard saying, "I might need him to see a nurse," no attempt was made to have medical or mental health staff assess him to determine if he was at imminent suicide risk and take appropriate action.

7. The officers were grossly indifferent to Mr. Thao's serious medical need, i.e., imminent suicide risk. They failed to take appropriate action to address his acute mental health crisis and suicide risk. Mr. Thao showed clear evidence of agitation and fearfulness, and that he was out of contact with reality, and he repeatedly made suicidal statements. He also made statements that he was on drugs. His lab results were positive for methamphetamine. Nevertheless, the officers failed to refer him for immediate mental health assessment. If no mental health personnel were available at night, at the very least, officers should have referred him to the medical staff on duty for evaluation.

The Oklahoma Jail Standards stipulate that "Medical triage screening shall be performed on all prisoners immediately upon admission to the facility and before being placed in the general population or housing area." If such a medical triage screening was performed, his mental health crisis could have been identified, leading to appropriate medical/psychiatric intervention, including suicide watch or observation.

8. The officers were grossly indifferent to Mr. Thao's special mental health needs by improperly housing him in a cell where he could not be observed by camera or in person unless an officer walked by the cell, lifted the flap on the door, and looked into the cell. It is not clear that officers could see the entire inside of the cell even when lifting the flap.

The Oklahoma Jail Standards require that "Those individuals who appear to have a significant medical or psychiatric problem, or who may be a suicide risk, shall be transported to the supporting medical facility as soon as possible. They shall be housed separately in a location where they can be observed frequently by the staff at least until the appropriate medical evaluation has been completed."

The ACA Standards for Adult Local Detention Facilities provide that: "Written policy, procedure, and practice require that all special management inmates are personally observed by a correctional officer twice per hour, but no more than 40 minutes apart, on an irregular schedule. Inmates who are violent or mentally disordered or who demonstrate unusual or

**Exhibit 3**

bizarre behavior receive more frequent observation; suicidal inmates are under continuing or continuous observation." The Jail fell drastically short of this standard in its observation of Mr. Thao.

9.   Failure to recognize a detainee in a mental health crisis, including drug-related behavior change, failure to refer a detainee for mental health assessment and failure to properly house a detainee, indicate a lack of adequate training of the Jail staff. I have seen PowerPoint slides produced by the Jail but have not seen evidence that Jail staff were aware of the slides, understood them, or were trained on them.

The most vulnerable period for suicide risk by a detainee is the first 24-72 hours. In addition, the potential suicide risk is higher for those in mental health crisis and drug intoxication.

Conclusions:

Based on the available records, I conclude with a reasonable degree of medical and professional certainty that Grady County Justice Authority and its staff were grossly indifferent to Mr. Thao's serious medical need, i.e., imminent suicide risk by failing to properly screen him for suicide risk. Furthermore, they failed to refer him to mental health or medical staff for assessment and provide appropriate housing. Such gross deviations from the standard of care caused or contributed significantly to Mr. Thao's suicide attempt on November 16, 2017, and his eventual death on November 18, 2017.

I reserve my right to provide a supplemental report when additional documents, including depositions, become available.

I attach the required rule 26 documents, including my Curriculum Vitae, fee schedule, and cases where I testified during the last four years.

_____
A. E. Daniel, M.D.

Date of Report:  March 13, 2023

**Exhibit 3**