## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1)  XOUCHI JONATHAN THAO,<br>SPECIAL ADMINISTRATOR FOR<br>THE ESTATE OF KONGCHI JUSTIN THAO,<br><br>PLAINTIFF,<br><br>v.<br><br>(2)  GRADY COUNTY CRIMINAL JUSTICE<br>AUTHORITY, ET AL.<br><br>DEFENDANTS. | CASE NO.: CIV-19-1175-JD |

## PLAINTIFF'S MOTION TO EXCLUDE OR LIMIT THE OPINIONS OF DEFENSE EXPERT DR. RICHARD HOUGH

Pursuant to the Court's Amended Scheduling Order (ECF 81),[1] Plaintiff Xouchi Jonathan Thao, as Special Administrator for the Estate of Kongchi Justin Thao, files this Motion to Exclude or Limit the testimony of Dr. Richard Hough based upon *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

### I.   INTRODUCTION

Dr. Hough opinions are a compilation of legal conclusions, medical and other opinions he is not qualified to give, and bare conclusions untethered to any

---

[1] The court extended the scheduling order's deadline for *Daubert* motions by seven days. ECF 119.

methodology or testing. His opinions would confuse and mislead the jury, invade the province of the court, and otherwise be unhelpful.

Although significant and unexplained analytical gaps exist between Dr. Hough's opinions and the material he reviewed, his report attempts to bridge that gap with opinions that Defendant complied with undefined and nebulous standards, while simultaneously stating that no standards exist. Dr. Hough's inability to articulate an identifiable standard renders his opinions about compliance unreliable.

Finally, Dr. Hough's opinions are based on compliance with he calls "generally accepted practices and procedures" and "whether the facts . . . fall above or below those standards." Dr. Hough consistently relies on vague terms like consistent with "contemporary" or "customary" standards without identifying or articulating any basis for those purported standards. Because Dr. Hough cannot use generic linguistic crutches as a substitute for actual correctional standards, those opinions should be excluded.

## II.   ARGUMENT AND AUTHORITY

### A.   OPINIONS EXPRESSING LEGAL CONCLUSIONS MUST BE EXCLUDED

"If [expert] testimony 'articulates ultimate principles of law' and directs a verdict, it is impermissible." *Estate of Marquez Smart v. City of Wichita*, 2020 U.S. Dist. LEXIS 116292, at *8 (D. Kan. July 2, 2020) (citing *Specht v. Jensen*, 853 F.2d

805, 808 (10th Cir. 1988)). In *Estate of Smart*, the court excluded opinions from a use of force expert that certain actions were "excessive" or "unreasonable" because those opinions "are legal conclusions that usurp the jury's role by applying the facts to the law." *Id*.; *cf. Niederstadt v. Eldridge*, 2016 U.S. Dist. LEXIS 103540, at *5 (D.N.M. Aug. 5, 2016) ("'Seizure,' 'search,' 'detention,' 'reasonable suspicion,' and 'probable cause' are 'legal conclusion(s)'").

The Hough report contains several legal conclusions that the Court should exclude from trial:

**1. The opinion that there was "no violation of law" regarding the adequacy of training (ECF 63-1 at 10)**

Professor Hough opines that: "Regardless of policy, there is no violation of established law as officers are trained." (ECF 63-1 at 10.) Whether the adequacy of jailer training "violated the law" is a classic legal conclusion. Dr. Hough cannot define the law or usurp the role of the Court in defining the law. *See*, *e.g.*, *Radiologix, Inc. v. Radiology & Nuclear Med., LLC*, 2018 U.S. Dist. LEXIS 29934, at *24 (D. Kan. Feb. 26, 2018) (opinions that agreement "violated the law" were improper legal conclusions). Dr. Hough should not be permitted to tell the jury that Defendant's training did not violate the law.

2. **The opinion that a violation of written standards does not merit consideration for constitutional analysis (ECF 63-1 at 11, 20, ¶ 19)**

Dr. Hough provides a legal opinion that Defendant's violation of written standards does not merit consideration as a constitutional violation. (ECF 63-1 at 11, 20, ¶ 19.) The Court does not need Dr. Hough's legal opinion about what standards are considered for purposes of determining whether Defendant violated the Constitution. Further, his legal opinion is wrong under Tenth Circuit precedent. *See, e.g.*, *Mata v. Saiz*, 427 F.3d 745, 757 (10th Cir. 2005) ("While published requirements for health care do not create constitutional rights, such protocols certainly provide circumstantial evidence that a prison health care gatekeeper knew of a substantial risk of serious harm."); *Lopez v. LeMaster*, 172 F.3d 756, 761 (10th Cir. 1999) ("While these [jail] standards do not establish constitutional parameters for the reasonable measures necessary to insure inmate safety, they do provide persuasive authority concerning what is required."). In addition to the virtual legal brief that is page eleven of the report, Dr. Hough plans to tell the jury that adherence to certain American Correctional Association standards are not "required to by the State of Oklahoma or the USMS [United States Marshals Service] Agreement," as if he were the arbiter of what is required by Oklahoma law or a contract with the federal government. (ECF 63-1 at 11.)

> **3. The opinion that there was no "deviation from standard care" because "a person being sued must know of an objective serious medical need and then, for the subjective component, intentionally or deliberately fail to provide required treatment." (ECF 63-1 at 20 ¶ 18).**

Dr. Hough first provides a medical opinion – what is the standard of care for someone experiencing a mental health crisis – then adds his legal analysis of whether Defendant met the standard for deliberate indifference. Both are impermissible. Moreover, the standard he articulates for deliberate indifference is contrary to circuit precedent that allows Estate prove *Monell* liability without a single underlying constitutional violation. *See*, *e.g.*, *Quintana v. Santa Fe Cty. Bd. of Comm'rs*, 973 F.3d 1022, 1033-34 (10th Cir. 2020) ("[W]e concluded in *Garcia* that even where the acts or omissions of no one employee may violate an individual's constitutional rights, the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights.")

### B. CONCLUSORY OPINIONS MUST BE EXCLUDED

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." *R.C. Olmstead, Inc., v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) (citation omitted).

Not only do many of Hough's opinions rely on legal conclusions and

psychiatric expertise, many of his opinions are conclusions that lack meaningful support:

- Defendant's "Jail General Orders are in alignment with the state-mandated guidelines from [] DOH" (ECF 61-3 at 6);

- Defendant was not required to classify Justin "as a Federal detainee 'Turnaround[2]'" (ECF 61-3 at 7);

- The Oklahoma Jail Standards do not require an intake screening for "Federal 'Turnarounds'" (ECF 61-3 at 7);

- "[T]he [Defendant] did not participate in the voluntary for-pay standards review by the [ACA]" (ECF 61-3 at 11);

- "The term ['special management inmate' as used in the contract with the USMS] did not apply to [] Justin Thao in this matter" (ECF 61-3 at 11);

- "The investigations/reviews were conducted in a manner consistent with contemporary law enforcement and internal affairs/professional standards unit methods." (ECF 61-3 at 16);

- "[Defendant] has in place acceptable correctional management policies." (ECF 61-3 at 16);

- "The conditions of confinement . . . were reasonable and proper." (ECF 61-3 at 17);

- "Corrections staff properly rely on USMS staff and reports regarding the status of incoming Federal detainees. . ." (ECF 61-3 at 17);

-  "The act of suicide was not a reasonably foreseeable outcome of placement of [Justin] . . . in [Cell 126 and] . . . staff were reasonably

---

[2] "Turnaround" inmate is a term made up by Defendant jail staff to describe people in federal custody who will stay at the jail for 24 hours or less. It does not appear in the Oklahoma Jail Standards, the jail's contract with the U.S. Marshals Service, the American Correctional Association standards, or any other applicable professional standards identified in this case.

6

- relying on their training, experience, and supervision." (ECF 61-3 at 17);

- "Training is provided . . . on relevant topics for staff, to include potential behaviors signaling mental health issues, and suicide. On-the-job training is also a component of how employees learn critical task areas of security and safety . . . This combination of training components and modes constitutes an adequate training program." (ECF 61-3 at 18);

- "Temporary detention at a [jail] does not constitute a new admission booking. Reclassification is not called for." (ECF61-3 at 18);

- "Based on preparations, policies, training, and proper supervisory action, the [jail] responds to health and medical matters . . . consistent with contemporary jail corrections medical practices" (ECF 61-3 at 19);

- "[The jail] uses acceptable correctional management methods." (ECF 61-3 at 19);

- "Officers assigned to jail duties have received training in appropriate inmate supervision." (ECF 61-3 at 19);

- "[T]raining instituted and conducted by the [jail] . . . was adequate and in conformance with applicable state law or standards and routine and customary practice . . ." (ECF 61-3 at 20);

- "The policies, practices, training records, and materials and testimony in this matter show that supervision of corrections employees of [the jail] were adequate and in conformance with applicable state law or standards and routine and customary practice in U.S. jail operations." (ECF 61-3 at 20);

- "There is no deviation from the standard of care indicated in the [jail] policies addressing medical care of inmates, nor in the arrangement through a medical provider to service ongoing medical needs." (ECF 61-3 at 20);

- "Plaintiff asserting policy and standards violations, neither drops below established constitutional minimums, nor is compelling to

7

>impose or substitute for the judgment of local jail administrators."
>(ECF 61-3 at 20).

The report falls short of explaining "how" and "why" the facts lead to the opinions bulleted above, many of which rely on impermissible legal conclusions.

For example, Dr. Hough does not explain how Defendant's supervision was "adequate" or consistent with "routine and customary practice," despite undisputed evidence that jailers failed to conduct a timely sight check on a person loudly exclaiming that he intended to kill himself. (*Compare* Ex. 1, p. 8 (Oklahoma Jail Standards (OJS) § 310:670-5-2(3)) *with* Ex. 3, pp. 14:23-15:16) (admission by warden of OJS violation). The same is true about his opinion regarding adequate training despite the absence of guidance to identify, supervise, and manage Special Management Inmates. (Ex. 5, Farley depo., pp. 97:22 – 98:3). Instead, Hough concludes that various policies and operations are adequate in relation "standards" and "customary practices" that he does not identify or cite. Dr. Hough should not be permitted to give these conclusory opinions.

## C.    THE METHODOLOGY IS NOT CAPABLE OF TESTING

Throughout his report, Dr. Hough does not define the standards used in his opinion. Often no such standards exist. (ECF 61-3 at 4) (describing a "broad knowledge" Dr. Hough uses to announce if facts "fall above or below [generally accepted] standards"). Rather than identify any specific standard to analyze against

8

the facts, the standard used by Dr. Hough to identify practices as "customary" or "contemporary" does not exist by any name.

This methodology was rejected in *Erickson v. City of Lakewood*, 2021 U.S. Dist. LEXIS 185191 (D. Colo. Sept. 21, 2021), where a court excluded expert opinions based on use of an "undefined and nebulous standard." *Id*. at *38. As the court recognized, "[The expert] does not explain or identify what the standard [] practices that he relies upon are, whether they are written in a manual or book, or how the practices that he relies upon (and not other practices) became the standard by which the Court should determine the reasonableness of defendants' actions." *Id*. at *41-42. "Because there is no indication what methodology [the expert] used in deriving these standards, the Court is not able to determine whether the methodology is reliable." *Id*. at *42-43. The same is true here.

Dr. Hough's opinion oscillates between claiming there are no written standards that apply to a federal "turnaround" while simultaneously stating the jail complied with all applicable standards. The opinion reaches this conclusion without identifying any standard that supports the characterization. Absent some methodology detailing what standard the jail supposedly complied with, there is no reliable way to evaluate Dr. Hough's characterization. In fact, we know Defendant violated the OJS by failing to perform hourly welfare checks. Okla. Admin. Code 310:670-5-2(3) (requiring one visual sight check every hour to include all areas of

9

the cell). Dr. Hough should not be allowed to tell a jury the Defendant complied with standards without any methodology, particularly when such opinion is demonstrably false.

Similarly, Dr. Hough concludes the USMS contractual term, "Special Management Inmate" (SMI) did not apply to Justin. (Ex. 2, USMS at p. 8). SMI is a term of art that describes inmates who are "violent or mentally disordered or who demonstrate unusual or bizarre behavior." (Ex. 4, 4-ALDF 2A-50). Dr. Hough concluded the term does not apply because Defendant failed to classify Justin as SMI. (ECF 61-3 at 10) (noting instead that Defendant had policies for "Special Needs Inmates," a different definition entirely that includes "disabled inmates, deaf inmates, inmates with walking impairments, non-English speaking inmates, or foreign nationals"). In fact, Defendant has no policy for supervision of SMI as required by its federal contract, only increased supervision for suicide risks. (Ex. 3, pp. 92:15-93:5). Dr. Hough should not be allowed to tell the jury that Defendant satisfied its contractual obligations with respect to Justin.

For one opinion to which he cites a standard, that standard does not support his proposition at all. Dr. Hough opines that: "Nor, based on the circumstances of his projected 10-12-hour or less temporary custody, would a Federal detainee typically be classified in a local jail as a special management inmate." (ECF 63-1 at 10.) He cites to "American Correctional Association, 4-ALDF," in support. The

10

Fourth Edition of Performance-Based Standards for Adult Local Detention is hundreds of pages, none of which distinguish between federal and local detainees and none of which use expected time in custody to as a basis for determining whether someone in custody is considered a Special Management Inmate. This is something Dr. Hough simply made up.

Similarly, Dr. Hough opines that: "The GCLEC put in place components of both policy and training reasonably designed to guide staff in addressing self-harm by inmates, including attempting suicide. The framework in place at the GCLEC was like facilities of similar size for the same issue of inmate self-harm and suicide. *Id*. at 14. (citations omitted). This assertion cites to training materials for which there is no evidence that a single GCLEC jailer on duty the night of the incident received. *Id*. at fn. 56. For the assertion about training at facilities of the same size as GCLEC, he offers no data or methodology to support that opinion, even if the size of the facility were relevant to the appropriate training on dealing with a mental health crisis, which is a premise he also does not support.

Dr. Hough further states without support that Defendant was not obligated to comply with the OJS because Justin was a "turnaround" inmate. (ECF 63-1 at 9). The OJS are codified at 74 O.S. § 192 with standards promulgated by the Department of Health (DOH). *See, e.g.*, 310:670-5. Those standards define "prisoner" as "*any individual*, whether in pretrial, sentenced or unsentenced status

11

who is confined in a jail facility." (Ex. 1, OJS, p. 2) (emphasis added). By any measure, Justin Thao was prisoner as defined by the OJS. For the safety of prisoners, the OJS require that there "shall be at least one (1) visual sight check every hour which, shall include all areas of each cell and such sight checks shall be documented." (Ex. 1, OJS, p. 8.) Nevertheless, Dr. Hough opines that the Defendant was not obligated to comply with the OJS because Justin was a turnaround. (ECF 63-1 at 9). Dr. Hough never explains why some provisions of the OJS would apply to turnarounds but not others, or how anyone can discern the difference besides him. Indeed, the Oklahoma Department of Health's definition provides no exception to the all-encompassing definition of "prisoner" in the state regulation. *See, e.g., Martin v. Phillips*, 2018 OK 56, ¶ 9, 422 P.3d 143, 147 ("Exceptions, after all, should not be read into a statute which are not made by the legislative body.") (Citations omitted).

### D. DR. HOUGH IS NOT QUALIFIED TO RENDER OPINIONS OUTSIDE THE FIELD OF CORRECTIONS

Dr. Hough intends to offer numerous opinions at trial that he is not qualified to give based upon his education and experience. Dr. Hough is not a medical doctor and has no disclosed expertise in the fields of medicine, anatomy, audiology, physiology, or human factors.

Citing to studies on mental chronometry, neuroscience, and cognitive distraction, Dr. Hough opines that: "Human perception involves some stimuli

(information) crossing a conscious threshold, and far more not crossing that threshold." (ECF 61-2 at 8.) He ventures into these areas far beyond his expertise to suggest what detention officers should be expected to actually hear in a correctional setting.

Much of pages 12 through 17 of Dr. Hough's report reads like a psychiatry treatise, including trends in society at large and depression among jail *staff*:

- "The quasi-standardization of suicide screening assessments has not led to effective statistical group predictability, let alone application to specific individuals and their intent to carry out self-harm. Depression is not synonymous with suicidal. More than 1 in 4 adults in the U.S. suffers with some type of mental illness and nearly 10% age 18 and up have a major depressive illness, women twice as much as men." *Id*. at 12-13 (citation to psychiatric journals omitted).

- "In jails, the U.S. Bureau of Justice Statistics reported that "…64 percent of local jail inmates, were found to have a mental health problem." Estimates in 2014 for jail inmates with mental illness were "75 percent of women and 63 percent of men." *Depression is significant among corrections workers as well, with one study estimating one-third of its mid-west jail officer population as experiencing depressive symptoms*. Notably, during 2015-2018, 13.2% Americans used antidepressant medications. 7.1% of Americans were estimated in 2017 to be affected by a major depressive disorder.47 Yet, in 2018, the suicide rate was 14.2 per 100,000.48 The highest suicide rates in the U.S. are elderly men, those over 85.49 And yet we are reminded that statistics describe groups, not individuals, and that lists of "factors" are not predictive instruments." *Id*. at 13 (citations to mental health treatise and article omitted; emphasis added).

- "Estimates of the number of jail inmates with a history of recent mental disorders runs to more than one third. The various mental health challenges these inmates face include bipolar disorders, posttraumatic stress disorder, disorders related to depression, and the list continues. Perhaps one fourth of inmates report anxiety disorders, 3% have psychotic disorders, and upwards of 50% report some type of mental disorder. Many disorders remain

undiagnosed or unadmitted for a wide variety of reasons. It is important to note that mental illness within the general population is varied, frequent, and is rarely associated with violence or suicide." *Id*. at 13-14 (citations to articles on mental illness and drug court omitted.)

- "As with the majority of jail inmates, Mr. Kongchi Justin Thao may have *manifested some of the behaviors across the range of factors that impact suicidality, though I have not reviewed empirical documentation of such behaviors accumulated in a way that triggered a placement on any type of suicide watch. If isolated behaviors occur by any or all the inmates in a jail, this does not create a circumstance to place everyone into one large room and sit with them. These behaviors are spread throughout society, and arise from families, life stressors, and the individual thought processes of the person in any setting, including, infrequently, one who takes his or her own life*." *Id*. at 15. (emphasis added to attempted psychiatric diagnosis of Mr. Thao and all of society).

- "The importation of a person's entire reality occurs when they cross the threshold of a detention or correctional facility." *Id*.

- "Prediction remains elusive with no method showing results to reliably identify a window of suicide." *Id*. (citing to psychiatry medical journal).

- Dr. Hough's opinion that suicide was not "reasonably foreseeable" requires psychiatric education, training, and expertise that he does not have and, in any event, does not rely on any methodology that the Court or the jury could assess in evaluating its accuracy. Suicide was not a "reasonably foreseeable" outcome. *Id*. at 17, ¶ 4.

- *See also*: "Such utterances by frustrated, angry, upset inmates are not de facto declaration of suicidal intent." *Id*. at 8.

The Court should exclude Dr. Hough's opinions that are outside the scope of his expertise.

### III. CONCLUSION

Plaintiff Estate respectfully requests that the Court exclude or limit the opinions of Dr. Hough as set forth above.

Respectfully submitted,

BRYAN & TERRILL

s/*J. Spencer Bryan*
Steven J. Terrill, OBA # 20869
J. Spencer Bryan, OBA # 19419
BRYAN & TERRILL LAW, PLLC
2500 S. Broadway, Suite 122
Edmond, OK 73102
T/F:   (918) 935-2777
Email: sjterrill@bryanterrill.com
Email: jsbryan@bryanterrill.com

and

Glenn Katon (pro hac vice)
Katon.Law
385 Grand Ave., Ste 200
Oakland, CA 94610
T: (510) 463-3350
F: (510) 463-3349
Email: gkaton@katon.law

**COUNSEL FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

On July 21, 2023, I served counsel of record in this case with the foregoing document through the Court's ECF filing system.

s/*J. Spencer Bryan*
J. Spencer Bryan
