# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

XOUCHI JONATHAN THAO,       )
Special Administrator for the Estate of  )
KONGCHI JUSTIN THAO,       )
                  )
       Plaintiff,       )
                  )
v.                  )    Case No. CIV-19-01175-JD
                  )
GRADY COUNTY CRIMINAL JUSTICE  )
AUTHORITY,           )
                  )
       Defendant.      )

## ORDER

Before the Court are a Motion for Partial Summary Judgment [Doc. No. 66] and a Motion to Supplement [Doc. No. 172] filed by Plaintiff Xouchi Jonathan Thao, Special Administrator for the Estate of Kongchi Justin Thao ("Estate"), in addition to Defendant Grady County Criminal Justice Authority's ("GCCJA") Motion for Summary Judgment [Doc. No. 124]. The parties have filed responses, replies, exhibits, and supplemental authority to these motions [Doc. Nos. 86, 87, 151, 154, 164, 175, 181, 182, and 183], which has been considered by the Court. The only remaining claims—and those subject to the summary judgment motions—are the Estate's Eighth Amendment claims against GCCJA.

This case involves a federal inmate who committed suicide while temporarily housed in the Grady County Law Enforcement Center. The Court is saddened by the facts of this case. But the evidence does not show that GCCJA's training or policies were

established with deliberate indifference to the risk of violating constitutional rights. Without establishing deliberate indifference in the municipal liability context, the Estate cannot prevail on its Eighth Amendment claims against GCCJA. Consequently, the Court denies the Estate's motions and grants GCCJA's motion.[1]

## I.    **BACKGROUND**[2]

In 2017, Kongchi Justin Thao ("Thao") was convicted of a federal crime and sentenced to twelve months and one day in federal prison. In November 2017, the United States Marshals Service ("USMS") transferred Thao from the Otero County Prison Facility in New Mexico to the Los Angeles Metropolitan Detention Center in California. On the way, Thao and other federal "turnaround" inmates were temporarily housed at the Grady County Law Enforcement Center ("jail"). [Doc. No. 124-7 at 1]. Turnaround inmates are federal inmates that are being transported elsewhere but stay at the jail for a few hours overnight. According to the USMS's "Prisoner in Transit Medical Summary" which included a box that could be checked for "suicide watch," Thao did not have any medical issues. [Doc. No. 151-1 at 1].

While in the jail's holding area with the other turnaround inmates, Thao ran in the direction of a jail nurse standing near the door. An officer stopped Thao and restrained him. The officer put Thao in handcuffs and escorted him to the elevator. Several other

---

[1] The Court uses CM/ECF page numbering from the top of filings in citations, if available. Otherwise, the Court uses the page numbering at the bottom of the filings.

[2] The Court recounts only the facts relevant to its analysis and those needed to provide context.

officers accompanied them in the elevator. While in the elevator, one guard, Officer Henneman, tased Thao on his leg. The officers then walked Thao from the elevator to cell 126. Cell 126 was primarily used as a shower cell but was sometimes used for turnaround inmates who were difficult to control. The cell had a covered door window and was equipped with an intercom but no video surveillance. It was near the sallyport which led to the bus area. When needed, turnaround inmates would spend a few hours in cell 126 before being escorted to the bus area for transport. The cell next door, cell 127, was used similarly. In 2015, an intoxicated inmate experiencing a drug overdose died in cell 127.

At approximately 2:41 a.m., Thao was placed in cell 126. Around 2:53 a.m., he requested and received a bath towel due to the floor being wet. Around 3:07 a.m., an officer visually checked on Thao through the door window. Around 3:19 a.m., Thao and a female inmate next to him in cell 127 began conversing loudly. During this conversation, Thao made statements like "I'm gonna fucking commit suicide," and "I might as well kill myself. I'm not gonna be shot. Just fucking send me home." They conversed off and on until about 4:10 a.m. At approximately 4:21 a.m., Officer Henneman went to cell 126 to prepare Thao for transport. He found Thao's body hanging by his neck in his cell with the towel tied around the door handle. Thao was immediately pulled down, administered CPR, and taken to the emergency room. He did not survive.

At the time of this incident, GCCJA had policies regarding how and when officers were supposed to use force (such as tasing) and how frequently officers were supposed to check on inmates. For example, officers were required to physically conduct a visual check on every inmate once every hour. For inmates on suicide watch, officers were

3

required to do this check every fifteen minutes. Inmates on suicide watch were not placed in cells 126 or 127. The officers received training on these policies and other topics such as what behaviors were indicative of mental illness.

The Estate sued GCCJA in the District Court of Grady County, Oklahoma. It brought several Eighth Amendment claims against GCCJA via municipal liability. GCCJA removed the case to this Court.[3]

## II.    <u>LEGAL STANDARD</u>

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is material if under the substantive law it is essential to the proper disposition of the claim." *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016) (internal quotation marks and citation omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (explaining that a dispute over a material fact is genuine "if a rational jury could find in favor of the nonmoving party on the evidence presented" (citation omitted)). In applying this standard, the Court "review[s] the facts and all reasonable inferences those facts support[ ] in the light most favorable to the nonmoving party." *Doe*, 952 F.3d at 1189

---

[3] The suit originally included several other parties and claims, but those have since been dismissed. *See* [Doc. Nos. 36, 46, 88, 114].

(second alteration in original) (quoting *Evans v. Sandy City*, 944 F.3d 847, 852 (10th Cir. 2019)).

"When the parties file cross motions for summary judgment, '[the court is] entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts.'" *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quoting *James Barlow Fam. Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997)). "Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Id.* (quoting *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979)).

## III.   ANALYSIS

GCCJA's motion seeks judgment as a matter of law on both the Estate's failure to provide adequate medical care and excessive force claims. These Eighth Amendment claims are brought under a municipal liability theory by the Estate against GCCJA. The Estate seeks partial summary judgment on the issue of municipal liability for its excessive force claim. It also asks the Court for leave to supplement its briefing in response to GCCJA's motion.

## A.    GCCJA was not deliberately indifferent for purposes of municipal liability.[4]

The Estate argues that GCCJA violated Thao's Eighth Amendment rights because he was not provided adequate medical care and Officer Henneman used excessive force when he tased Thao. The Estate contends GCCJA's official policies caused these constitutional violations and that it was deliberately indifferent to the risk of causing constitutional injury.

"[A] municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983." *Canton*, 489 U.S. at 385 (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694–95 (1978)). "[A] plaintiff seeking to impose liability on a municipality under § 1983" must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."[5] *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997).

---

[4] "The state of mind required to prove a constitutional violation is distinct from the state of mind that may be required to show that a municipality *caused* a constitutional violation." *Dodds v. Richardson*, 614 F.3d 1185, 1209 n.2 (10th Cir. 2010) (Tymkovich, J., concurring) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 n.8 (1989)).

[5] "[T]o establish municipal liability, a plaintiff must first demonstrate a 'municipal policy or custom,' which may take one of the following forms: '(1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.'" *Waller v. City & Cnty. of*

An entity is not liable under § 1983 "unless deliberate action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." *Id.* at 400 (emphasis omitted). "For individual defendants, the applicable state of mind will depend on the type of constitutional violation at issue. In contrast, the prevailing state-of-mind standard for a municipality is deliberate indifference regardless of the nature of the underlying constitutional violation." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 771 n.5 (10th Cir. 2013) (citations omitted). Thus, "to hold a municipality liable, a plaintiff must prove that (1) an official policy or custom (2) caused the plaintiff's constitutional injury and (3) that the municipality enacted or maintained that policy with deliberate indifference to the risk of that injury occurring." *George ex rel. Bradshaw v. Beaver Cnty. ex rel. Beaver Cnty. Bd. of Comm'rs.*, 32 F.4th 1246, 1253 (10th Cir. 2022).

Since in this case the third element is dispositive, the Court's analysis focuses on GCCJA's deliberate indifference. *See Crowson v. Washington Cnty.*, 983 F.3d 1166, 1186 (10th Cir. 2020) ("[I]t is important to begin with the Supreme Court's direction in *Collins v. City of Harker Heights* that 'proper analysis requires us to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation.' The absence of an affirmative answer to either of these

---

*Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (quoting *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010)).

questions is fatal to a claim against the municipality." (citation omitted) (quoting 503 U.S. 115, 120 (1992))).

When the municipality has notice that its action or failure to act is substantially certain to result in a constitutional violation, and the municipality consciously or deliberately chooses to disregard the risk of harm, the deliberate indifference standard is met. *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) ("The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." (citing *Brown*, 520 U.S. at 407)). The Tenth Circuit further explained that

> notice can be established by proving the existence of a pattern of tortious conduct. In a "narrow range of circumstances," however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

*Id.* at 1307–08 (citations omitted) (first and second quoting *Brown*, 520 U.S. at 409; and then quoting *Canton*, 489 U.S. at 390 & n.10).

Consequently, to meet this standard, GCCJA would need to have noticed that its action or inaction was substantially certain to result in the Eighth Amendment violations

the Estate raises—failure to provide medical care and the use of excessive force—and

then disregard that risk.[6]

                1.    <u>GCCJA was not deliberately indifferent to the risk of failing to</u>
                       <u>provide adequate medical care.</u>[7]

The Estate argues GCCJA's training of its officers was deliberately indifferent to

the risk of failing to provide adequate medical care. Specifically, the Estate contends

GCCJA was deliberately indifferent because it did not provide training on (1) how to

identify or handle suicidal inmates or (2) how to supervise inmates housed in cell 126.[8]

The Estate claims that the inmate death that occurred in 2015 in the cell next to 126, cell

127, put GCCJA on notice that its current training on suicidal inmates and supervision of

cell 126 would lead to a violation of someone's constitutional rights. *See* [Doc. No. 154

at 15] ("As set forth above, Estate cited a prior death in an adjacent cell that provided

---

     [6] In its complaint, the Estate technically listed five claims against GCCJA. However, several of these "claims" are just allegations of municipal liability. *See* [Doc. No. 1-2 at 11] (listing "inadequate training" and "inadequate supervision" as "entity claims"). Case law and the Estate's subsequent briefing reveal that the two constitutional claims the Estate brings against GCCJA are a failure to provide adequate medical care claim and a use of excessive force claim, both under the Eighth Amendment.

     [7] It is important to highlight that "a finding of 'deliberate indifference' is also required to hold prison officials liable for violating inmates' Eighth Amendment right to humane conditions of confinement. Deliberate indifference, however, is defined differently for Eighth Amendment and municipal liability purposes. In the prison conditions context, deliberate indifference is a subjective standard requiring actual knowledge of a risk by the official. In the municipal liability context, deliberate indifference is an objective standard which is satisfied if the risk is so obvious that the official should have known of it." *Barney*, 143 F.3d at 1307 n.5 (citations omitted).

     [8] Although the Estate references the failure to supervise, its filings and arguments show that it is referencing the officers' lack of training on how to specifically supervise cell 126, not GCCJA's failure to supervise its officers.

actual notice to Defendant that the cell lacked adequate supervision and it was clear that officers lacked adequate training on identifying and addressing mental health and substance abuse crises among inmates.").

At the outset, the Court notes that "'[o]ne prior incident, even if it was a constitutional violation sufficiently similar to put officials on notice of a problem, does not describe a pattern of violations.'" *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1287 (10th Cir. 2019) (alteration in original) (quoting *Coffey v. McKinley Cnty.*, 504 F. App'x 715, 719 (10th Cir. 2012) (unpublished)). "'One instance, however egregious, does not a pattern or practice make.'" *Id.* (quoting *Martin v. Malhoyt*, 830 F.2d 237, 255 (D.C. Cir. 1987)). Viewing the evidence in the light most favorable to the Estate, GCCJA was not put on notice via a pattern of tortious conduct.

So, for GCCJA to be deliberately indifferent, a violation of federal rights must have been highly predictable or plainly obvious given its action or inaction. This can be established "when a county fails to train jail guards on how to handle recurring situations presenting an obvious potential to violate the Constitution." *Lance v. Morris*, 985 F.3d 787, 801 (10th Cir. 2021). But importantly, as the Supreme Court's "decision in *Canton* makes clear, 'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410.

Here, GCCJA has put on evidence that its officers were trained on how to supervise inmates, identify suicide risks, and handle those types of situations. For example, Officer Gerlach, GCCJA's representative, affirmed that officers were trained

10

"on when they should contact the nurse on duty regarding the condition of someone in custody," [Doc. No. 154-3 at 26], and how to identify "behavior" consistent with "substance abuse problems" [*id.* at 21]. When asked if the officers' "training involve[d] identifying suicide risks," Officer Gerlach answered "yes." [Doc. No. 124-8 at 26]. He said, although the officers "don't receive a certificate or degree on it," "they're basically trained on how to identify as a general person somebody that's in distress or somebody that has some tendencies that they might hurt themselves." [*Id.*]. Officer Gerlach also agreed that the officers received "suicide prevention training" that was included as part of their "annual training on the state jail standards." [*Id.* at 27]. Officer Gerlach stated they received training on the jail's policies and procedures and training manuals. Excerpts of these materials include:

> Staff shall provide twenty-four (24) hour supervision of inmates. [Doc. No. 151-2 at 1].

> At the beginning of each shift, the shift supervisor will assign officers to designated areas within the detention facility and will document the assignment with central control. Officers will remain in the unit assigned unless relieved by another officer and will ensure that they are able to see or hear the activities of the inmates so they can respond promptly to emergency situations. [*Id.* at 4].

> Safety Checks: Assigned officers will complete a welfare check of inmates at least once every hour, or more frequently if needed, by visually looking into living areas and observing the inmates for signs of mental or physical distress, unrest between or among inmates or any other behavior that suggests a problem could be developing. [*Id.* at 4–5].

> Inmates who are mentally ill shall be separated from other inmates. Every effort shall be made to contact a local hospital, clinic, or mental health facility for the detention of the mentally ill. [Doc. No. 151-4 at 2].

Suicide Risks. Inmates with a history of suicide attempts or threats will be placed in a two-person cell (safety and security permitting) with increased supervision regardless of their security score, pending further review and evaluation by the mental health staff. [*Id.* at 3].

Similarly, Officer Duncan stated the officers received forty hours of training on these policies and procedures. He affirmed that "if an inmate were to say that he was going to kill himself," his training required him to "bring [the inmate] straight to medical for medical to make -- to speak with him and make a determination from there." [Doc. No. 124-15 at 5]. Officer Duncan explained that the officers are not trained to identify mental health issues in the diagnostic sense but that their training helped them identify conduct that was indicative of mental health issues such as "change in appetite, change in appearance, [and] change in behavior." [Doc. No. 124-15 at 8].

Additionally, Officer Farley, a shift supervisor at GCCJA, had the following exchanges with the Estate's attorney, Mr. Katon, and GCCJA's attorney, Mr. Moon, at his deposition:[9]

> Mr. Katon: Are you given any training on what to do if any prisoner either says that they want to commit suicide or gives some other indication that they might be a suicide risk?
>
> Officer Farley: Yes.
>
> Mr. Katon: What is that training?
>
> Officer Farley: To bring them to the nurse and let the nurse determine if they need to be put on suicide watch or not.
>
> Mr. Katon: Is that considered a very serious concern at the Grady County Law Enforcement Center?

---

[9] For readability, the Court has omitted the parties' objections to the form of these questions.

Officer Farley: Yes.

Mr. Katon: As a shift supervisor, if a detention officer told you that an inmate joked about killing themselves, and the detention officer didn't do anything about it, would you instruct the detention officer that that was not acceptable?

Officer Farley: Yes.

. . .

Mr. Moon: If an inmate did present something that might indicate to you or another detention officer that they might be suicidal, were you trained in what to do in that incident -- or instance?

Officer Farley: Yes.

Mr. Moon: What would you -- what were you trained to do?

Officer Farley: At that point in time, we would let medical know that we have a potential suicidal inmate, let her know everything that's going on, and then she'll make the call to put them on suicide watch or not.

. . .

Mr. Katon: And you mentioned to Mr. Moon that you were trained on what to do if an inmate expressed to you any intention to commit suicide. Is that right?

Officer Farley: Yes.

Mr. Katon: Were you trained to listen to what inmates were saying that did not constitute a threat of suicide but might indicate a mental health crisis?

Officer Farley: I don't quite understand that question.

Mr. Katon: So if somebody said to you, "Hey, Farley, I'm going to kill myself," it would be very clear what you were required to do. Right?

Officer Farley: Yes.

Mr. Katon: If there were other things that an inmate said like "Just kill me. I want to die," is it clear what an officer should do if they heard that?

Officer Farley: Yes.

Mr. Katon: What[] should the officer do when they hear that?

Officer Farley: At that point in time, we need to get him pulled out, pull him downstairs, and if it's safe to do so, let him talk to the nurse.

Mr. Katon: And that's because they said, "Just kill me"?

Officer Farley: Yes.

Mr. Katon: So -- so what training did you receive about what things that an inmate said would require you to bring them right to the nurse other than the obvious "I'm going to kill myself"? What's the training on that?

Officer Farley: Any kind of threat of harm to oneself or any other needs to be dealt with.

Mr. Katon: Okay. So how about "I want to die. I just want to die"? Is that a threat of harm that would require you to bring the person to the nurse under your training?

Officer Farley: Yes. If I heard that, I would take them down to the nurse.

[Doc. No. 124-9 at 22–26].

"A plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Brown*, 520 U.S. at 411. Here, the Estate has failed to demonstrate this. GCCJA has put on evidence that its officers were trained to handle suicide risks, respond to inmates with mental illness, identify behaviors that would suggest an inmate would hurt himself, and take inmates to medical staff as the jail's policies mandated. The Estate has proffered no evidence to the contrary; nor has it presented evidence as to what

this training, which it argues was inadequate, entailed. And, unlike other cases, there is no evidence that GCCJA was aware of any deficiencies with its training. *See Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1049–50 (10th Cir. 2022) ("To the extent that employees participated in training, they were administered tests on which they were encouraged to cheat using provided answer keys . . . . Miller, the only [jail] employee with any medical background, testified that she had no training on mental health issues and was not qualified to diagnose medical conditions . . . .[T]he Sheriff was aware of these serious deficiencies in training."). Thus, the Estate does not genuinely dispute that GCCJA trained its officers on how to handle these types of recurring situations, and no reasonable trier of fact could find that GCCJA's training of its officers was substantially certain to lead to a constitutional violation.[10]

Regarding whether GCCJA was deliberately indifferent because it did not specifically train its officers on how to use cell 126, the Tenth Circuit has adopted a three-part test "to determine whether a particular problem is likely to recur enough to alert county officials to an obvious deficiency in the training[:]"

---

[10] The Estate also cites to *Lance v. Morris* in support of its arguments. 985 F.3d 787, 801 (10th Cir. 2021). In *Lance*, the county adopted policies but did not train its officers on those policies. *See id.* ("The county adopted a policy stating that '[s]upervisors will determine the immediacy of medical complaints and take the appropriate action . . . . But [plaintiff] presented evidence that the county hadn't trained employees how to determine 'the immediacy of medical complaints,' particularly when medical personnel were away from the detention center."). Here, the Estate has presented no such evidence. The evidence presented by GCCJA, however, shows officers received training on their policies and procedures.

1. The county's policymakers know "to a moral certainty that [their] employees will confront a given situation."

2. "[T]he situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult."

3. "[T]he wrong choice . . . will frequently cause the deprivation of a citizen's constitutional rights."

*Lance*, 985 F.3d at 802 (alteration in original) (quotations omitted) (quoting *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)).[11]

Specific training on how to prevent suicide in cell 126 does not meet any of these parts. First, GCCJA did not know with moral certainty that its officers would confront this type of situation—i.e., a situation where a turnaround inmate with no documented mental health issues in his medical summary would commit suicide in cell 126. It of course knew its officers would need to supervise inmates in a variety of situations—

_____

[11] The three-part *Lance* test's place in the inadequate training/deliberate indifference framework is not entirely clear. In *Valdez*, the Tenth Circuit affirmed a district court's decision to treat these three parts as the "element[s] of deliberate indifference." *Valdez v. Macdonald*, 66 F.4th 796, 830 (10th Cir. 2023). Conversely, in *Prince*, the Tenth Circuit analyzed whether a municipality's inadequate training was deliberately indifferent by referencing the *Barney* standard instead of the *Lance* test. 28 F.4th at 1050 (citing *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998)); *see also George ex rel. Bradshaw v. Beaver Cnty. ex rel. Beaver Cnty. Bd. of Comm'rs.*, 32 F.4th 1246, 1258 n.3 (10th Cir. 2022). The Court determines that the *Lance* test is best understood as a way of answering the specific question of whether "a problem would recur often enough to require training," not the more general question of whether a municipality was deliberately indifferent. *Lance*, 985 F.3d at 801. So, the Court only analyzes the Estate's second argument regarding cell 126 under the *Lance* test because for its first argument the GCCJA does not dispute that officers should receive training regarding how to handle inmates with mental illnesses (i.e., suicide, substance abuse, etc.). But regardless of what test is used, the Court concludes that, based on the record before it, a rational trier of fact could not find that GCCJA's training of its officers was deliberately indifferent to the risk of an Eighth Amendment violation.

hence the one-hour check in requirement. And it knew its officers would encounter inmates with mental illnesses—hence its training on how to identify and respond to those behaviors. But it is not realistic to say that GCCJA's policymakers were certain the officers would encounter this given situation. Municipalities cannot be expected to train for every single factual scenario. Second, supervising an inmate in cell 126 did not present any difficult choices that training would have made less difficult. Officers were already trained on how to supervise inmates. They were trained to visually check on inmates once every hour and look for signs of suicidal ideations. So, it is not clear what additional "choices" officers would need to make when supervising cell 126 inmates or how different training would make such choices easier. Lastly, nothing in the record suggests a wrong choice would deprive an inmate of his constitutional rights.

The Estate argues that, because GCCJA did not address each *Lance* factor, the Court should deny its motion. However, the Estate forgets that GCCJA does argue that the Estate cannot show GCCJA was deliberately indifferent—albeit using different cases than those cited by the Estate. *See* [Doc. No. 124 at 29] ("To establish deliberate indifference to a need for training, Plaintiff must show that the Defendant knew of and disregarded the substantial risk of inadequate training of its employees . . . . Here, Plaintiff cannot demonstrate a specific deficiency in the training of GCCJA staff which was obvious and closely related to the alleged violations of the Decedent's constitutional rights."). And more importantly, here (and other places in its briefing), the Estate misunderstands its burden. "The moving party does not have to negate the nonmovant's claims in order to obtain summary judgment." *Barney*, 143 F.3d at 1307. "'[T]he movant

only bears the initial burden of showing—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (alteration in original) (quoting *Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997)). "'If the movant carries this initial burden, the non-movant may not rest upon its pleadings, but must set forth specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.'" *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir. 1996) (quoting *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995)). Therefore, the Court rejects the Estate's argument that GCCJA's motion must be denied on this basis.

The Court concludes a rational trier of fact could not find that GCCJA acted with deliberate indifference, for purposes of municipal liability, based on the evidence presented. Viewing GCCJA's motion in the light most favorable to the Estate, the Court concludes there is no genuine dispute as to any material facts and GCCJA is entitled to judgment as a matter of law on the Eighth Amendment adequate medical care claim.

2.   GCCJA was not deliberately indifferent to the risk of its officers using excessive force.

The Estate argues Officer Henneman's tasing of Thao "was consistent with the GCCJA's policies or practices and is, therefore, attributable to the GCCJA for purposes of municipal liability." [Doc. No. 66 at 5]. GCCJA argues it is entitled to summary judgment because "Plaintiff cannot demonstrate that the Defendant was deliberately indifferent to a substantial risk that any agent, employee or officer of the GCCJA would

use excessive force against inmates or ignore a known substantial risk that they might attempt to commit suicide." [Doc. No. 124 at 28].

To begin, the Estate has not pointed the Court to evidence of "an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019). For instance, the Estate does not direct the Court to evidence in the record showing that GCCJA officers routinely use excessive force on inmates. And although its complaint could feasibly be read to allege ratification, the Estate does not raise any such arguments in its motion or response to the GCCJA's motion. The Court thus centers its analysis on whether GCCJA enacted or maintained "formal regulation[s] or policy statement[s]" with deliberate indifference to the risk of its officers unconstitutionally using excessive force. *Id.*

The Court includes excerpts of GCCJA's policy and procedures on the use of force below:

> The use of physical force by staff shall be restricted to instances of justifiable self-protection, protection of others, protection of property and prevention of an escape, and shall be only to the degree necessary. [Doc. No. 151-3 at 16].

> The GCCJA authorizes detention officers to use only the force which is reasonably necessary to achieve lawful objectives, defend themselves or others from physical harm, to prevent escapes, and then only as a last resort, and overcome resistance. In no event is physical force used as punishment. Detention officers should make decisions to use force in light of their C.L.E.E.T. training, in-service training, and this policy. [Doc. No. 151-5 at 1].

19

Presentation of Less Lethal Weapons: Detention officers may present issued and authorized less lethal weapons, such as the straight wood baton, ASP, the TASER, or O.C. Spray, when the detention officer feels that such presentation may diminish aggressive actions in the given situation. Also included in this category is the use of such devices as pepperball rounds and stingers . . . . In order to use the less lethal weapon the officer must be trained and certified prior to use. [*Id.* at 3].

A TASER will not be deployed on a handcuffed individual without articulable extenuating circumstances. [*Id.*].

Detention officers are authorized and empowered to use necessary force as allowed by this policy, their C.L.E.E.T. training, and in-service training and the Use of Force Outline, Attachment A. Detention officers will be held responsible for their own actions and the actions of all detention officers under their supervision in situations where force is used. [*Id.* at 4].

Less Lethal Weapons: 1. All deputies and detention officers will be trained in the use of less lethal weapons prior to issuance or use of such weapons. 2. Less lethal weapons may be used only as allowed by this policy. 3. Except in extreme emergencies, any weapon which is not authorized or for which training is not provided should not be employed in use of force situations. 4. When less lethal force is utilized, deputies and detention officers will ensure that individuals receive the appropriate level of medical attention, depending on the nature and extent of the injury or the alleged injuries received. [*Id.* at 4–5].

Detention officers are required by state law to report to their immediate supervisor if they witness another detention officer using force which exceeds the degree of force permitted by law or by the policies and guidelines of the GCCJA. [*Id.* at 9].

At the end of each calendar year, the Jail Administrator will conduct an analysis of all use of force incidents occurring during the preceding year to determine whether any policies need revision, any patterns of abuse or excessive force exist or supplemental training is required. [*Id.* at 10].

Every detention officer will be issued a copy of this policy and be instructed on its contents. Officers will also be instructed as to the contents of this policy and any revisions each time they qualify with firearms. [*Id.*].

The Estate does not present evidence that there is a pre-existing pattern of excessive force constitutional violations. And it is not plainly obvious or highly predictable that the above policies would lead to a violation of federal rights. On the contrary, the policies set limitations on the use of force, mandate use of force training, and establish a review period for use of force incidents. As previously stated, to succeed on a claim against a municipal entity, a plaintiff must present "facts showing (1) an official policy or custom, (2) causation, and (3) deliberate indifference." *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1145 (10th Cir. 2023). Based on this evidence, no rational trier of fact could find that GCCJA was deliberately indifferent. Viewing the Estate's Motion in the light most favorable to GCCJA, and GCCJA's Motion in the light most favorable to the Estate, the Court concludes there is no genuine dispute as to any material facts and GCCJA is entitled to judgment as a matter of law on the Eighth Amendment excessive force claim.[12]

### B.    The Court denies the Estate's Motion to Supplement.

The Estate's Motion to Supplement is two pages. It points the Court to *Crowson v. Washington County*, 983 F.3d 1166, 1186 (10th Cir. 2020) and highlights its systemic failure arguments.

The Court denies the Estate's Motion to Supplement because it is satisfied that these arguments were sufficiently raised in the Estate's briefing. *See Lucas*, 58 F.4th at

---

[12] In its motion, the Estate argues that GCCJA has conceded Officer Henneman's actions were in accordance with its official policies. That may be true. However, that does not mean GCCJA's official polices are deliberately indifferent to the risk of constitutional violations.

1144 n.7 ("While Plaintiff does not refer to *Crowson* by name in the complaint or district court briefing, the mention of systemic deficiencies in the complaint, various examples, and her responses to the motions to dismiss raise a systemic injury argument.").

Additionally, considering how the Court has resolved the parties' motions, these arguments are not determinative. Systemic failure can serve as the underlying constitutional violation "where no individual action by a single officer rises to a constitutional violation" but the sum of several officers' "actions nonetheless violate the plaintiff's constitutional rights." *Crowson*, 983 F.3d at 1191; *see also Lucas*, 58 F.4th at 1144 ("[I]t was error for the district court to not consider a systemic failure as the underlying constitutional violation."). Some of the evidence that shows systemic failure can also go to the elements of municipal liability. But systemic failure does not automatically establish deliberate indifference, or any other element, in the context of municipal liability.

For these reasons, the Court denies the Estate's Motion to Supplement.

## IV.    **CONCLUSION**

Consequently, the Court GRANTS GCCJA's motion [Doc. No. 124] and DENIES the Estate's motion [Doc. No. 66]. The Court also DENIES the Estate's Motion to Supplement [Doc. No. 172]. Although other pending motions exist, the Court does not reach those issues given its above analysis and conclusions. A judgment will separately follow.

IT IS SO ORDERED this 30th day of September 2024.

JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE