**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

**November 26, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

XOUCHI JONATHAN THAO, Special
Administrator for the Estate of Kongchi Justin
Thao,

      Plaintiff - Appellant,

v.

GRADY COUNTY CRIMINAL JUSTICE
AUTHORITY,

      Defendant - Appellee,

and

JAMIE MEYER; JOHN BAKER; RALPH
BEARD; JIM WEIR; JACK WEAVER; JIM
GERLACH,

      Defendants.

No. 24-6226

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:19-CV-01175-JD)**
_____

Jennifer J. Clark, Sidley Austin LLP, Washington, D.C. (Glenn Katon, Katon Law,
Oakland, California, and Ogemdi Maduike, Sidley Austin LLP, Washington, D.C., with
her on the briefs), for Plaintiff–Appellant.

Andy A. Artus (Jamison C. Whitson and W. R. Moon, Jr., with him on the brief), Collins
Zorn & Wagner, PLLC, Oklahoma City, Oklahoma, for Defendant–Appellee.
_____

Before **McHUGH**, **EID**, and **ROSSMAN**, Circuit Judges.

_____

**McHUGH,** Circuit Judge.

_____

## I.    INTRODUCTION

Kongchi Justin Thao committed suicide on November 16, 2017, while detained in the Grady County Law Enforcement Center ("facility") in Chickasha, Oklahoma. En route to a jail in California, Mr. Thao was housed overnight at the facility and was placed in a holding pod with other inmates. After Mr. Thao tried to run out of the pod, detention officers handcuffed and transported him to Cell 126, a shower cell on a different floor used occasionally to isolate troublesome inmates. While transporting Mr. Thao to Cell 126, one of the officers tased Mr. Thao in the elevator.

In the hour and a half preceding his death, Mr. Thao repeatedly cried out from his cell for someone to kill him and threatened to harm himself. Detention officers told him to be quiet. Mr. Thao's unconscious body was later discovered hanging from the door of his cell. After being transported to the hospital, Mr. Thao died.

Mr. Thao's brother, Xouchi Jonathan Thao, as the administrator of his estate, ("Estate"), commenced this 42 U.S.C. § 1983 action against Defendant-Appellant Grady County Criminal Justice Authority ("GCCJA") and various individual defendants, alleging excessive force and deliberate indifference to serious medical needs in violation of the Eighth Amendment, among other claims.

2

The district court denied the Estate's motion for partial summary judgment and granted summary judgment to GCCJA, concluding a reasonable juror could not find that GCCJA was deliberately indifferent to the risk of its officers using excessive force or failing to train its officers to provide adequate medical care. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part, and reverse in part.

Turning first to the Estate's excessive force claim, we affirm summary judgment because GCCJA's written taser policy is facially constitutional. Thus, GCCJA cannot be liable even if an officer, in contravention of that policy, employed excessive force.

Next, we conclude there are disputed issues of material fact about what training detention officers received concerning how to detect inmate suicide risks prior to Mr. Thao's death. Accordingly, we hold that summary judgment in favor of GCCJA was improper on the Estate's deliberate indifference to serious medical needs claim. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## II.    BACKGROUND

### A. Factual Background

**1. Mr. Thao's Transfer to GCCJA**

In August 2017, Mr. Thao pleaded guilty to one count of conspiracy to possess a controlled substance with intent to distribute, in violation of 21 U.S.C. § 846 and § 841(a)(1). The district court sentenced him to one year and one day of incarceration. Mr. Thao's defense counsel requested that he "be incarcerated in a

federal facility as close to Clovis, California as possible" to be near his family. App.
Vol. I at 229. The U.S. Marshals Service subsequently prepared him for transport to a
detention center in Los Angeles, California. As part of that process, a marshal
completed Form 553—the medical summary form for inmates in transport. The only
information on that form relevant to an inmate's mental health is a box that can be
checked to indicate if the inmate had been placed on suicide watch or experienced
psychiatric decompensation in the prior month. That box was left unchecked on
Mr. Thao's Form 553, and he was cleared for transit on November 13, 2017.

On November 15, 2017, Mr. Thao arrived at the GCCJA facility with several
other federal inmates. Federal inmates like Mr. Thao who are at the facility for only
an overnight stay are called "turnaround" inmates. *Id.* at 244. The facility receives
anywhere from 100 to 200 turnaround inmates every 12 hours or so. Prison officers
separate turnaround inmates from other inmates when they arrive, placing the former
in a holding pod and the latter in general population cells. Mr. Thao arrived at the
facility around 6:00 p.m. and was taken to the "A Pod," a segregated holding pod
used for housing turnaround inmates.

**2.    Mr. Thao Runs Out of the Holding Pod and is Tased**

Around 2:40 a.m. that night, two detention officers and a nurse approached the
A Pod to administer medication to inmates with prescriptions. When the door to the
pod opened, Mr. Thao rushed toward it, apparently "trying to run out of the room."
App. Vol. III at 242.

As soon as Mr. Thao stepped out of the pod, Officer Christopher Harrison put him in a headlock and pressed Mr. Thao's body against the wall. Officer Harrison then sat on Mr. Thao, put him in handcuffs, pulled him up by his waist, and led him away. At the time, Mr. Thao was 20 years old, weighed 120 pounds, and was 5 feet, 2 inches tall.

Mr. Thao, whose hands were cuffed behind his back, was then taken to an elevator by Officer Harrison. Five more detention officers joined Officer Harrison in the elevator, surrounding Mr. Thao. A couple of the officers tackled Mr. Thao to the floor once inside. Four officers held Mr. Thao prone during the elevator ride, which lasted around forty-five seconds. No officer put his body weight on Mr. Thao. While Mr. Thao was prone and handcuffed on the elevator floor, Officer Trever Henneman "removed the cartridge from his GCCJA issued X26 Taser and administered a 'drive stun'" on Mr. Thao's right thigh. App. Vol. I at 232.

### 3.    Mr. Thao is Detained in Cell 126

Once the elevator doors opened, Officer Henneman and an unidentified detention officer escorted Mr. Thao into Cell 126. Cell 126 served as a shower cell for inmates in the booking area but was also used by the facility as a "backup room just in case there was somebody that was out of control." App. Vol. IV at 6, 7. Because Cell 126 primarily functioned as a shower cell, it did not have a camera—unlike all the other holding cells in the booking area. In addition, a solid hatch cover closed off the cell's only window.

Before Mr. Thao entered the cell, he said "sorry" multiple times.[1]  Although multiple officers appear on the surveillance footage while Mr. Thao was in Cell 126, the record on summary judgment identifies only three of them as interacting with Mr. Thao before he hanged himself: Officer Rebecca Brown; Officer Harrison; and Officer Henneman. It also indicates that Sergeant Johnnie Farley, the shift supervisor, arrived on the scene at some point, but it is unclear whether it was after Mr. Thao hanged himself. Once inside the cell, Mr. Thao begged the officers "Can you please try to help me?" through the cell's intercom. App. Vol. III at 243. An unidentified officer told him to "calm down," and Mr. Thao stated twice "You said they were going to kill me." *Id.* Another unidentified officer responded, "Nobody wants to kill you. Dude I don't know what your problem is," to which Mr. Thao replied, "Okay. I'll calm down. Please make sure I get help, I'm innocent. I'm scared for my life." *Id.* at 244.

Around ten minutes after entering Cell 126, at 2:53 a.m., Mr. Thao requested and was given a bath towel by Officer Harrison because the cell's floor was wet. As Officer Harrison was leaving the cell, Mr. Thao pleaded "Help me please." *Id.* Officer Harrison closed the cell door.

---

[1] The following account of the events that occurred once Mr. Thao was put in Cell 126 are taken from surveillance footage with audio from the hallway, a transcript of said surveillance footage, and the facility's incident report of Mr. Thao's suicide.

At 3:07 a.m., Officer Brown performed the first and only sight check on

Mr. Thao while he was detained in Cell 126, by lifting the hatch cover and glancing

through the small window in the cell door.[2] She reported that Mr. Thao was "seated

on the bench with his elbows rested on his knees," and he "appeared calm and alert."

App. Vol. II at 160. Seconds later, Mr. Thao began to cry out incomprehensibly. He

can be heard saying in the surveillance footage, "No man, this is fucked up." App.

Vol. III at 247. In response, Officer Brown opened the door to the hallway and said

to him, "Hey, how bout you shut the fuck up." *Id.* Mr. Thao responded, "[S]orry." *Id.*

A few minutes later, at 3:16 a.m., Mr. Thao loudly implored, "Please don't kill me.

Please." *Id.*

Beginning at 3:19 a.m., a female inmate detained in the cell next to Mr. Thao's

started banging on her cell's door and yelling. Over the next fifty minutes or so, the

female inmate berated Mr. Thao because he asked her to be quiet. She repeatedly

expressed being upset that a man was next to her. Mr. Thao requested she "please

---

[2] The Oklahoma State Jail Standards requires officers to do "at least one (1) visual sight check every hour." App. Vol. IV at 36. On January 25, 2016, an inspection by the Oklahoma Department of Health found a violation of Oklahoma Jail Standards because the inspector "found evidence that jailers were watching the cameras and using the speaker monitors to do their [required] hourly sight checks." *Id.* at 73. This inspection was prompted by a prior death that occurred in 2015 in Cell 127, the cell next to 126. The inspector's recommended plan of correction advised jail administrators to "ensure[] that jail staff conduct[] at least one sight check every hour that includes all areas of each cell and document each check in accordance with jail standards." *Id.* This policy was not strictly followed in Mr. Thao's case, as he remained in the cell for over an hour and fifteen minutes between the sight check and when his unconscious body was discovered.

7

stop." *Id.* at 250. At 3:21 a.m., Officer Henneman walked through the corridor, "hear[ing] Mr. Thao having [this] loud conversation with [the] female inmate." App. Vol. I at 232.

During this approximately fifty-minute period during which the female inmate was reviling Mr. Thao, from 3:21 until 4:09 a.m., Mr. Thao repeatedly asked the officers to kill him and expressed his killing as inevitable: "Just kill me please. Just, just kill me," App. Vol. III at 251; "Fuck. I'm ready to die. Just shoot me," *id.* at 252; "Come kill me. I know you're gonna fucking kill me, so do it. Fuck. I'm ready to die. Just shoot me," *id.*; "I don't got a home. I'd rather die. It's not a joke," *id.* He also threatened self-harm: "I'm gonna fucking commit suicide," *id.* at 251; "And I might as well kill myself. I'm not gonna be shot. Just fucking send me home," *id.*

Then around 3:28 a.m., the hallway door opened, and Mr. Thao screamed. An unidentified officer in the hallway tells Mr. Thao, "[S]hut up or you won't go." *Id.* at 252. A few minutes later, Mr. Thao implored, "Please come kill me. Sorry. Come kill me." *Id.* Then, at 3:43 a.m., Mr. Thao said, "Kill me. A hundred people want to kill me." *Id.* at 253. The female inmate repeatedly complained about Mr. Thao "crying" and "screaming over the top." *Id.* at 250, 254.

At 3:54 a.m., as an unidentified officer walked through the hallway, Mr. Thao yelled, "I'm right here come kill me." *Id.* at 253. A police officer and two detention officers, one of whom was Officer Henneman, then entered the hallway to process an inmate.

Referring to Mr. Thao, the unidentified detention officer said that he "tried to charge at [a] nurse" and Officer Henneman responded that he "got an ass whooping." *Id.* at 254. During the time the officers were in the hallway processing an inmate, Mr. Thao yelled, "just kill me, please." *Id.* at 255. The unidentified detention officer responded, "You kids make nice and play," and Mr. Thao shouted back "Nah, fucking kill me. Not like kids play." *Id.* The unidentified detention officer said to the man they were processing, "[Y]ou ain't gonna act like that are you?" and chuckled. Before Officer Henneman and the unidentified detention officer exited the hallway in front of Cell 126, Mr. Thao said, "Come shoot me. Come kill me–don't play this game. Man I'm fucking tired of this shit. Fucking kill me." *Id.* at 254–55.

Around 4:10 a.m., Mr. Thao declared, "If you're going to do it then fucking shoot me. Cause I'm fucked up dog . . . Man, just come fucking kill me dog. What do you want from me? What do you want from me? Fucking [twenty] years old, what do you want from me?" *Id.* at 256. Those are the final words heard from Mr. Thao on the surveillance footage.

### 4.    Officer Discovers Mr. Thao's Unconscious Body

At 4:19 a.m., detention officers entered the hallway to bring out the female inmate in the cell next to Mr. Thao's. At this time, Transport Officer Jimmy Duncan also requested that Officer Henneman remove Mr. Thao from his cell to prepare him for transport to a different facility.

At 4:22 a.m., Officer Henneman opened the door to Cell 126, and discovered Mr. Thao's unconscious body, dragging with the door. Mr. Thao had wrapped the

towel given to him by Officer Henneman around his neck and hung himself on the cell's door handle. Officer Henneman exclaimed, "Shit, come here. Damn it, he fucking hung himself." *Id.* at 258. Once the paramedics got there, Officer Henneman explained to the paramedic, "[W]hen I checked on him . . . he was yelling. He was fine." *Id.* at 263. When the paramedic asked about Mr. Thao's "prior history," Officer Henneman responded that he knew "nothing." *Id.* at 264. Mr. Thao died from his injuries.

**5.    Use of Force Policy**

GCCJA's Use of Force policy at the time of Mr. Thao's death authorized "[D]etention officers to use only the force which is reasonably necessary to achieve lawful objectives, defend themselves or others from physical harm, to prevent escapes, and then only as a last resort, and overcome resistance. In no event is physical force used as punishment." Supp. App. at 53. The policy also stated that a taser "will not be deployed on a handcuffed individual without articulable extenuating circumstances." *Id.* at 55.

**6.    GCCJA Officer Training on Mental Health**

GCCJA's representative, Warden James Gerlach,[3] testified by deposition, as to the facility's training and screening procedures. Warden Gerlach described two

---

[3] GCCJA designated Warden Gerlach as its representative in response to Deposition Notice filed pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure. Warden Gerlach, "at all relevant times, was the [the facility's] Jail Administrator." App. Vol. I at 121. "The Jail Administrator is responsible for all persons employed, committed to, or visiting" the facility, as well as "for ensuring that the procedures and policy stated in the GCCJA Policies and Procedures are

methods by which detention officers were trained: (1) training on policies; and
(2) on-the-job training.

With respect to policies and procedures, Warden Gerlach stated that, as of
November 2017, the "only" training detention officers would have received on the
subject of "identifying mental health problems" were the materials contained in "the
policies and procedures and their training manual." App. Vol. IV at 20. The materials
provided to new hires during their orientation contained only "the state jail standards
and the jail's policies and procedures." App. Vol. I at 273.

Broadly, the Oklahoma State Department of Health Jail Standards ("state jail
standards") provide requirements for facilities such as GCCJA concerning the:
(1) admission and release of inmate records; (2) security and control protocols;
(3) supervision standards of prisoners; (4) prisoner rules and discipline;
(5) classification and segregation of prisoners; (6) safety, sanitary, and hygiene
standards; (7) food services and dietary requirements; (8) medical care and health
services; (9) mail and visitation; (10) training and staff development; and
(11) requirements for the existing physical facility. With respect to identifying and
housing inmates with significant medical or mental issues, the state jail standards
provide:

> Medical triage screening shall be performed on all prisoners immediately
> upon admission to the facility and before being placed in the general
> population or housing area. Those individuals who appear to have a

---

implemented and followed by all staff." *Id.* at 150–51. Warden Gerlach was
designated to testify about GCCJA's staffing, training, policies, and procedures.

significant medical or psychiatric problem, or who may be a suicide risk, shall be transported to the supporting medical facility as soon as possible. They shall be housed separately in a location where they can be observed frequently by the staff at least until the appropriate medical evaluation has been completed. If after stringent evaluation by the highest-ranking mental health professional, in conjunction with a senior detention supervisor, these prisoners may be authorized to share the same cell.

App. Vol. IV at 46. Thus, medical triage screening is required before an inmate is placed in a housing area. If the inmate appears to be suffering from a psychiatric problem, the state jail standards require that he be transported to a separate medical facility. There is no indication in the record that Mr. Thao received medical triage screening when he arrived at the facility.

However, GCCJA contends such screening was not required for turnaround inmates like Mr. Thao. According to Warden Gerlach, turnaround inmates "are never housed there [at the facility], they're just there for an overnight stay," and thus, the policy is inapplicable to them. App. Vol. I at 244. Due to the volume of turnaround inmates and the short duration of their stay at the facility, he explained, "there's no way and no practice possible to" subject them to medical screening. *Id.*

Therefore, the facility did not screen Mr. Thao before placing him in Pod A, which Warden Gerlach testified is considered a processing area, not a housing unit. Instead, "The GCCJA medical screening policy for federal 'turn-around' inmates is for medical staff to review the inmates' medical screening information provided on USMS Form 553 to determine whether an incoming 'turnaround' inmate has medication or other medical needs, including suicide risk." App. Vol. I at 197. Form 553 has only one item specifically related to mental health—a box indicating whether

12

the inmate was on "[s]uicide watch [or] psychiatric decompensation *within [the] past month*." App. Vol. III at 161 (emphasis added).

The state jail standards require facilities in the state to implement a "medical/mental health screening by trained facility personnel utilizing a questionnaire approved by the Department of Health, or a screening conducted by a physician or other licensed medical personnel." App. Vol. IV at 34. Form 553 is not filled out by "trained facility personnel"—instead, it is completed before the inmate arrives at the facility.[4] In Mr. Thao's case, it was completed *days* before he arrived at the facility. There is also no indication that Form 553 is approved by the Oklahoma State Department of Health as a suitable mental health screening questionnaire.

With respect to identifying inmates suffering from a mental health crisis, Warden Gerlach explained that any training new hires received on how to notice behavioral and mental health problems in an inmate already housed or placed in a processing unit such as Pod A "is something that's trained through experience," not through formally prepared materials.[5] *Id.* at 22. Because that training was through

---

[4] Warden Gerlach testified that he believed Form 553 was completed by medical staff at the prior facility.

[5] Warden Gerlach also testified that the state jail standards involved suicide prevention training. As discussed, however, although those standards call for screening before an inmate is placed in general population or a housing area, they contain no information about identifying a psychological crisis after an inmate is housed. Further, the record indicates that turnaround inmates underwent no pre-placement screening other than review of whether the box on Form 553 had been checked.

13

experience, Warden Gerlach was unable to testify as to whether any of the officers on duty the night of Mr. Thao's death had been trained to identify an inmate at risk of suicide. App. Vol IV at 19–20.

Some of the detention officers testified about their training on identification of inmates at risk of suicide.[6] For example, Officer Jimmy Duncan testified that he received training on "signs of what to look for" to identify an inmate in a mental health crisis. App. Vol. II at 50. It is unclear from the record, however, what involvement Officer Duncan had during Mr. Thao's detention in Cell 126—apart from requesting that Officer Henneman prepare Mr. Thao for transport to a different facility.

Officer Johnnie Farley, the shift supervisor on duty the night of Mr. Thao's death, explained that he attended a three-day orientation on the state jail standards before he began working as a detention officer and that he was tested on them periodically thereafter. Officer Farley indicated that the facility later implemented a Field Training Officer ("FTO") program that consisted of on-the-job training, with required reading on every computer. The parties have pointed us to nothing in the record that describes what information was contained in the required FTO reading.

As for identifying a risk of suicide, Officer Farley testified that

---

[6] The record on summary judgment before the district court does not include testimony from Officer Rebecca Brown or Officer Christopher Harrison.

14

Q:    Are you given any training on what to do if any prisoner either says that they want to commit suicide or gives some other indication that they might be a suicide risk? . . .

A:    Yes.

Q:    What is that training?

A:    To bring them to the nurse and let the nurse determine if they need to be put on suicide watch or not.

Q:    Is that considered a very serious concern at the [facility]?

A:    Yes. . . .

Q:    As a shift supervisor, if a detention officer told you that an inmate joked about killing themselves, and the detention officer didn't do anything about it, would you instruct the detention officer that that was not acceptable? . . .

A:    Yes. . . .

Q:    If an inmate did present something that might indicate to you or another detention officer that they might be suicidal, were you trained in what to do in that incident—or instance?

A:    Yes.

Q:    What would you—what were you trained to do?

A:    At that point in time, we would let medical know that we have a potential suicidal inmate, let her know everything that's going on, and then she'll make the call to put them on suicide watch or not.

Q:    And I think there was some questions asked about what you were—what you would do to identify a medical issue that an inmate might be having or possibly be having. In those situations, would detention officers generally defer to a nurse or err on the side of a–err on the side of caution?

A:    Yes. . . .

Q:    Is—was that a[] part of the policy and practice at the [facility] is to err on the side of caution and defer to the nurse?

A:    Yes. . . .

Q:    So if somebody said to you, "Hey, Farley, I'm going to kill myself," it would be very clear what you were required to do. Right?

15

A:    Yes.

Q:    If there were other things that an inmate said like "Just kill me. I want to die," is it clear what an officer should do if they heard that? . . .

A:    Yes.

Q:    What[] should the officer do when they hear that? . . .

A:    At that point in time, we need to get him pulled out, pull him downstairs, and if it's safe to do so, let him talk to the nurse.

Q:    And that's because they said, "Just kill me"? . . .

A:    Yes.

Q:    So—so what training did you receive about what things that an inmate said would require you to bring them right to the nurse other than the obvious "I'm going to kill myself"? What's the training on that? . . .

A:    Any kind of threat of harm to oneself or any other needs to be dealt with.

Q:    Okay. So how about "I want to die. I just want to die"? Is that a threat of harm that would require you to bring the person to the nurse under your training? . . .

A:    Yes, If I heard that, I would take them down to the nurse.

App. Vol. I at 281–85.

At his deposition, Officer Henneman stated that he had not received any training during his employment at the facility on how "to identify someone who's having a mental health episode." App. Vol. II at 16. On further questioning, however, he testified that if Mr. Thao had "ma[d]e any comment or statement" indicating he was "at risk of committing suicide," he would have "gone to medical." *Id.* at 25. If an inmate "said anything about suicide," he explained, "they went straight to medical." *Id.*

At the time of Mr. Thao's death, detention officers received "no specific training" on how to supervise inmates held in Cell 126. App. Vol. IV at 7. But officers knew not to "put people on suicide watch in Cell 126 or [1]27." App. Vol. II at 60.

Finally, Lieutenant Johnnie B. Drewery created a PowerPoint titled "Mental Health and the United States Prison System" that GCCJA references as evidence its detention officers were trained "regarding mental health of inmates and suicide prevention." App. Vol. I at 188; Appellee's Br. at 12. Although Warden Gerlach testified he believed the PowerPoint was created after Mr. Thao's death, Lieutenant Drewery confirmed that it was presented twice at the facility before Mr. Thao's suicide. At the first of those presentations on November 17, 2016, five to ten officers from GCCJA attended. On February 11, 2017, Lieutenant Drewery again presented his PowerPoint, but only officers from other facilities were present. Because there was no attendance record made, Lieutenant Drewery was unable to testify as to whether any of the officers on duty the night Mr. Thao died had the benefit of the PowerPoint training.

### B.    *Procedural Background*

On November 12, 2019, the Estate filed a complaint in Oklahoma state court asserting several claims against GCCJA and various individual defendants—in both their official and individual capacities—under 42 U.S.C. § 1983. The complaint alleged excessive force, failing to intervene to prevent that excessive force, and deliberate indifference in failing to provide adequate training and supervision to

prevent Mr. Thao's suicide. GCCJA then removed the case to the United States

District Court for the Western District of Oklahoma. The Estate dismissed its claims

against the individual defendants. The two remaining claims were against GCCJA for

(1) deliberate indifference in failing to provide adequate training to prevent

Mr. Thao's suicide, in violation of his Eighth Amendment right to adequate medical

care; and (2) excessive force based on the tasing incident.

On March 28, 2023, the Estate moved for partial summary judgment on the

issue of municipal liability for its excessive force claim. GCCJA filed its opposition

on April 18, 2023, arguing that the Estate had failed to carry its burden on summary

judgment. On July 21, 2023, GCCJA moved for summary judgment on both claims. It

argued the Estate could not show an underlying violation of Mr. Thao's constitutional

rights nor establish that its actions caused those purported violations. The parties

filed responses, replies, exhibits, and supplemental authority to the summary

judgment motions.

On September 30, 2024, the district court denied the Estate's summary

judgment motion and granted GCCJA's motion. It found the deliberate indifference

element dispositive of both claims.

As for the failure-to-train claim, the district court held that GCCJA was not

deliberately indifferent, because it had "put on evidence that its officers were trained

on how to supervise inmates, identify suicide risks, and handle those types of

situations," while, according to the district court, the "Estate has proffered no

evidence to the contrary." App. Vol. IV at 192, 196. The district court, drawing from

18

deposition testimony from Warden Gerlach, Officer Duncan, and Officer Farley, found that facility officers were trained to call a nurse if an inmate expressed suicidal ideation. It also cited excerpts from training materials that stated officers were to do safety checks every hour, separate mentally ill inmates from others, and place inmates with a history of suicide attempts in a two-person cell. The district court concluded, "the Estate does not genuinely dispute that GCCJA trained its officers on how to handle these types of recurring situations, and no reasonable trier of fact could find that GCCJA's training of its officers was substantially certain to lead to a constitutional violation." *Id.* at 197.

It similarly found that GCCJA was not deliberately indifferent for not specifically training "its officers on how to use [C]ell 126" because GCCJA could not have known that such a problem was "likely to recur enough to alert county officials to an obvious deficiency in the training." *Id.*

Turning to the excessive force claim, the district court determined that the Estate failed to show deliberate indifference on the part of GCCJA. It quoted GCCJA's Use of Force policy, finding that it "set limitations on the use of force, mandate[d] use of force training, and establish[ed] a review period for use of force incidents." *Id.* at 203. And it was not "plainly obvious or highly predictable" that the Use of Force policy "would lead to a violation of federal rights." *Id.* The district court also reasoned that even if Officer Henneman's actions were in accordance with official policy, that did "not mean GCCJA's official polices [were] deliberately indifferent to the risk of constitutional violations." *Id.* at 203 n.12.

The district court also denied the Estate's motion to supplement its summary judgment motion to advance a systemic failure argument. There, the Estate asserted that under that theory it need not show an underlying constitutional violation to impose 42 U.S.C. § 1983 municipal liability on GCCJA "in the specific context of inadequate medical care at jails and prisons." *Id.* at 159. But the district court was "satisfied that these arguments were sufficiently raised in the Estate's briefing," and regardless, it reasoned that a systemic failure argument did not alter the claim's dismissal. *Id.* at 203. While the district court agreed that systemic failure "can serve as the underlying constitutional violation," it concluded that a systemic failure does not "automatically establish deliberate indifference." *Id.* at 204.

The Estate timely appealed.

### III.    LEGAL STANDARDS

#### A.    *Standard of Review*

"We review summary judgment decisions de novo, applying the same legal standard as the district court." *Utah Animal Rts. Coal. v. Salt Lake Cnty.*, 566 F.3d 1236, 1242 (10th Cir. 2009) (quotation marks omitted). Summary judgment is warranted only if "particular parts of materials in the record" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(a).

"The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003). "Such a

movant may make its prima facie demonstration simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.* The nonmovant must then bring forth "specific facts showing a genuine issue for trial." *Garrison v. Gambro*, *Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (quotation marks omitted). These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment. *See Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000). At the summary judgment stage, we must "review the entire record" in the light most favorable to the nonmoving party. *Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir. 2000).

### B.  Municipal Liability

"To establish a claim for damages under § 1983 against municipal entities or local government bodies, the plaintiff must prove (1) the entity executed a policy or custom (2) that caused the plaintiff to suffer deprivation of constitutional or other federal rights." *Moss v. Kopp*, 559 F.3d 1155, 1168 (10th Cir. 2009). In other words, "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* (quoting *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 166 (1993)). A municipal policy or custom takes one of these forms

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these

policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (citation omitted). After establishing such a policy or custom, a plaintiff must demonstrate the causation element, that is, "a direct causal link between the policy or custom and the injury alleged." *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citation omitted).

With this legal background in mind, we turn to the Estate's two claims.

## IV.    ANALYSIS

### A.    *Excessive Force*

The Estate argues GCCJA's Use of Force policy is itself unconstitutional because it "authorized the tasing of a restrained, 5 f[ee]t, 2 inch tall man weighing only 120 pounds, while surrounded by no fewer than six officers." Appellant's Br. at 58. The district court granted summary judgment to GCCJA, concluding that the Estate had not shown that GCCJA was "deliberately indifferent to a substantial risk that any agent, employee or officer of the GCCJA would use excessive force against inmates." App. Vol. IV at 200–01, 203. Although we agree the Estate's excessive force claim cannot prevail, we do not agree with the district court's analysis. Where, as here, a plaintiff claims municipal liability based on an unlawful policy, liability is not tethered to the municipality's deliberate indifference. Rather, our focus is on whether the challenged policy is facially constitutional.

22

The Estate's excessive force claim is based on the Eight Amendment, which provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The use of excessive force against an inmate violates the Eighth Amendment because "the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319, (1986) (quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977)) (internal quotation marks omitted).

The Estate advances a theory of municipal liability grounded in an "affirmative policy"—GCCJA's  written Use of Force policy. Appellant's Br. at 51. Contrary to the district court's analysis, deliberate indifference is inapplicable to our review of that claim. Rather, deliberate indifference is germane to claims premised on inadequate supervisory practices (such as claims of inadequate hiring or training) and requires proof that the municipality disregarded a known or obvious risk of constitutional harm. *See Collins v. Harker Heights*, 503 U.S. 115, 124 (1992); *Waller*, 932 F.3d at 1284. The Supreme Court established this "rigorous standard[] of culpability" for "claims of inadequate hiring, training, or other supervisory practices," *Waller*, 932 F.3d at 1284, because "[a] less stringent standard of fault . . . would result in *de facto respondeat superior* liability on municipalities." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Canton v. Harris*, 489 U.S. 378, 392 (1989)). By contrast, "when an official municipal policy itself violates federal law, issues of culpability and causation are straightforward; simply proving the existence of the unlawful policy puts an end to the question." *Barney v. Pulsipher*, 143

F.3d 1299, 1307 (10th Cir. 1998) (citing *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397 (1997)).

Indeed, "proof that a municipality[] . . . has intentionally deprived a plaintiff of a federally protected right *necessarily* establishes that the municipality acted culpably." *Brown*, 520 U.S. at 405 (emphasis added). Because the Estate's excessive force claim depends on a formally promulgated policy, the appropriate "inquiry is whether the policy [] itself is unconstitutional so as to impose liability on [GCCJA] for its own unconstitutional conduct in implementing an unconstitutional policy." *Crowson v. Wash. Cnty. Utah*, 983 F.3d 1166, 1187 (10th Cir. 2020) (quotation marks omitted).

An official policy can be facially unconstitutional if it directs its employees to inflict constitutional injuries. *See Monell v. NYC Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) ("[I]t is when execution of a government's policy . . . inflicts the injury that the government as an entity is responsible under § 1983."). GCCJA's Use of Force policy states a taser "will not be deployed on a handcuffed individual without articulable extenuating circumstances." Supp. App. at 55. The Estate does not explain how this statement is facially unconstitutional—in other words, how its "straightforward enforcement," *Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1280 (10th Cir. 2009), instructs an officer to use force on an inmate "for the very purpose of causing harm" rather than for "maintain[ing] or restor[ing] discipline,"[7] *Whitley*, 475 U.S. at 320–

---

[7] "[A]n excessive force claim involves two prongs: (1) an objective prong that asks, 'if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation,' and (2) a subjective prong under which the plaintiff must show that 'the officials act[ed] with a sufficiently culpable state of mind.'" *Giron v.*

21. Indeed, it appears to sanction only the latter. If Officer Henneman tased Mr. Thao

without any "articulable extenuating circumstances," Supp. App. at 55, as the Estate

asserts he did, he would be *violating* GCCJA's official policy, not enforcing it "according

to [its] terms." *Christensen*, 554 F.3d at 1280. Thus, GCCJA's official policy on

excessive force does not offend the Eighth Amendment. *City of Okla. City v. Tuttle*, 471

U.S. 808, 820, (1985) (plurality opinion) (explaining the policy "must be 'the moving

force of the constitutional violation'" (quoting *Polk Cnty. v. Dodson*, 454 U.S. 312, 326

(1981))). As a result, the Estate's excessive force claim against GCCJA fails.

The Estate disagrees, focusing on GCCJA's admission in discovery that "Jail staff

acted consistent with official written policy or practices in place at the [facility] in the use

of the taser against [Mr.] Thao." App. Vol. I at 151. Based on this admission, the Estate

claims GCCJA's "official policy is for officers to deploy their taser against a 120-pound

man who was handcuffed." Reply Br. at 24. But the admission, when read in context, is

based on GCCJA's position that there were extenuating circumstances that justified use

of the taser. The Estate also fails to explain how this admission could supersede

GCCJA's written policy. To be sure, the Estate could have argued that this admission

supports an informal custom amounting to a widespread practice of excessive force, or a

---

*Corr. Corp. of Am.*, 191 F.3d 1281, 1289 (10th Cir. 1999) (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)) (internal quotation marks omitted) (second alteration in original). A jail "official has a culpable state of mind if he uses force 'maliciously and sadistically for the very purpose of causing harm,' rather than 'in a good faith effort to maintain or restore discipline.'" *Redmond v. Crowther*, 882 F.3d 927, 936 (10th Cir. 2018) (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)).

failure to train officers on GCCJA's excessive force policy.[8] But it did not. The Estate's claim is premised only upon the GCCJA's formally promulgated policy, and the Estate gives us no reason to conclude the GCCJA's Use of Force policy "itself is unconstitutional." *Crowson*, 983 F.3d at 1187 (quotation marks omitted).

Although we take no position on whether Officer Henneman's use of force in employing the taser was excessive in violation of Mr. Thao's Eighth Amendment rights, it is not dispositive of the municipal liability claim. *See Christensen*, 554 F.3d at 1271, 1280 (explaining that if an officer violated the plaintiff's constitutional rights due to his own discretionary actions, "the municipality would not be liable"). Officer Henneman's alleged violation of GCCJA's written Use of Force policy may create individual liability on Officer Henneman, but his presumed culpability cannot be imputed to GCCJA, where the official policy is constitutional.

---

[8] Indeed, the cases the Estate cites to support that the admission furnishes an official policy involve an entity or official's admission in the context of a claim based on an informal custom, *Am. Honda Fin. Corp. v. Twp. of Aston*, 546 F. Supp. 3d 371, 383 (E.D. Pa. 2021) (stating an admission in discovery can establish a custom), or a failure-to-train claim, *Paul v. City of Altus*, 141 F.3d 1185 (10th Cir. 1998) (holding the officer's incident report that stated he put his knee on the subject's neck "the way we're instructed to handcuff" created a genuine issue of material fact related to the improper training claim). These cases do not support the proposition that an admission in discovery overrides the express language of a written *official* policy.

For these reasons, we affirm the district court's grant of summary judgment in favor of GCCJA on the Estate's excessive force claim.[9]

### B. *Failure to Train*

The Estate also claims GCCJA violated Mr. Thao's Eighth Amendment right to adequate medical care by "(1) failing to train its detention officers on how to identify and assess when inmates are at-risk for suicide or experiencing a mental health crisis; and (2) failing to train officers on the unique challenges of how to monitor inmates housed in Cell 126, particularly when those inmates exhibit signs of mental distress." Appellant's Br. at 25. The district court granted summary judgment to GCCJA because it had "put on evidence that its officers were trained on how to supervise inmates, identify suicide risks, and handle those types of situations," and the Estate had "proffered no evidence to the contrary." App. Vol. IV at 192, 196.

The district court also determined that GCCJA was not deliberately indifferent to the risks of suicide in Cell 126 because it could not have known that such a problem was "likely to recur enough to alert county officials to an obvious deficiency in the training." *Id.* at 197 (quoting *Lance v. Morris*, 985 F.3d 787, 802 (10th Cir. 2021)). We need not decide whether the Estate's failure-to-train-claim related to the unique challenges of monitoring inmates in Cell 126 provides an independent basis for municipal liability here

---

[9] "[W]e can affirm on any ground supported by the record, so long as the appellant has had a fair opportunity to address that ground." *Stewart v. City of Okla. City*, 47 F.4th 1125, 1132 (10th Cir. 2022) (quotation marks omitted).

because we reverse on the broader failure-to-train claim.[10] Material factual issues remain about what training the officers responsible for supervising Mr. Thao while he was in cell 126 received regarding inmate suicide risks. We therefore reverse the district court's judgment as to the Estate's claim that GCCJA acted with deliberate indifference in failing to provide adequate training to prevent Mr. Thao's suicide.

Although jail officials, and the municipal entities that employ them, "cannot absolutely guarantee the safety of their prisoners," they nevertheless "have a constitutional duty to take reasonable steps to protect prisoners' safety and bodily integrity." *Est. of Burgaz ex rel. Zommer v. Bd. of Cnty. Comm'rs for Jefferson Cnty. Colo.*, 30 F.4th 1181, 1186 (10th Cir. 2022) (internal quotation marks omitted). "[C]laims based on a jail suicide are considered and treated as claims based on the failure of jail officials to provide medical care for those in their custody." *Cox v. Glanz*, 800 F.3d 1231, 1248 (10th Cir. 2015) (quotation marks omitted). Thus, such claims are assessed under the deliberate indifference to serious medical needs test. *See id.*

---

[10] The Estate argues its inadequate medical care claim is independently grounded in GCCJA's failure "to train its officers on the particular risk of suicide for inmates housed in Cell 126." Appellant's Br. at 40. But a claim related to deficient training in how to "supervise inmates and identify suicide risk in that cell" is already incorporated in the Estate's broader failure-to-train claim. *Id.* at 42. If GCCJA adequately trained officers on how to identify and handle inmates at risk of suicide, there would be no "need for specific training on how to identify suicide risks among inmates housed in the isolated cell." *Id.* at 43. Under those circumstances, officers would be equipped to identify suicide risks across factual scenarios and if an inmate housed in Cell 126 exhibited such signs, officers would be obligated by the facility's policy to remove them immediately from the cell.

While "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train," a plaintiff may succeed on a single-incident failure-to-train claim when "the unconstitutional consequences of failing to train" are "patently obvious."[11] *Connick*, 563 U.S. at 62, 64 (quoting *Brown*, 520 U.S. at 409). This court first addressed the test for determining when such claims can succeed in *Lance v. Morris*, 985 F.3d 787, 800 (10th Cir. 2021). We later summarized that holding, stating that a plaintiff presents a viable "single-incident failure-to-train claim" under *Lance* by showing: "(1) the existence of a [municipal] policy or custom involving deficient training; (2) an injury caused by the policy that is obvious and closely related; and (3) that the municipality adopted the policy or custom with deliberate indifference to the injury." *Valdez v. Macdonald*, 66 F.4th 796, 816–17 (10th Cir. 2023) (alteration in original) (internal quotation marks omitted).

On the third element, we have adopted the Second Circuit's test for deliberate indifference, which is satisfied when (1) the entity's "policymakers 'know to a moral certainty that their employees will confront a given situation'"; (2) "the situation 'presents the employee with a difficult choice of the sort that training or supervision will make less difficult'"; and (3) "[t]he wrong choice will frequently cause the deprivation of a citizen's constitutional rights." *Id.* at 817 (alteration in original) (quoting *Walker v. City*

---

[11] While the Estate invokes "the prior death in a cell similar to Cell 126 and the Notice of Violation for failing to properly monitor the cell," Reply Br. at 17, in the context of GCCJA's failure to provide "special training for the supervision of inmates housed in Cell 126," it does not argue that this death should be considered a prior incident in its broader failure-to-train claim, Appellant's Br. at 4.

*of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)). Importantly, "a failure-to-train claim may not be maintained without a showing of a constitutional violation by the allegedly un-, under-, or improperly-trained officer." *Crowson*, 983 F.3d at 1187.

### 1.    Disputes of Material Fact—Inadequate Training

Like the district court, we focus on the first *Lance* element—"the existence of a [municipal] policy or custom involving deficient training." *Lance*, 985 F.3d at 800 (quotation marks omitted). The district court found that the absence "of a [municipal] policy or custom involving deficient training" doomed the Estate's failure-to-train claim, *id.*, because GCCJA presented evidence that its "officers were trained to handle suicide risks, respond to inmates with mental illness, identify behaviors that would suggest an inmate would hurt himself, and take inmates to medical staff as the jail's policies mandated." App. Vol. IV at 196. And because it found the Estate "proffered no evidence to the contrary," the district court concluded that "no reasonable trier of fact could find that GCCJA's training of its officers was substantially certain to lead to a constitutional violation." *Id.* at 196–97. As a result, the district court did not consider the other requirements of a failure-to-train claim.

GCCJA offered testimony from Warden Gerlach that detention officers were trained through familiarity with the state policies and through experience. But Warden Gerlach provided testimony from which a reasonable juror could infer that the facility's formal policies and procedures included no formal training on identifying suicidality in housed inmates at the time of Mr. Thao's death. Warden Gerlach *incorrectly* testified that the state jail standards, which detention officers must review, provide such information.

Indeed, Warden Gerlach stated that, as of November 2017, the "*only*" training detention officers would have received on identifying mental health problems were the materials contained in the "policies and procedures and their training manual." App. Vol. IV at 20 (emphasis added). And Officer Farley explained that the only materials provided to him during his new hire orientation were "the state jail standards and the [GCLEC's] policies and procedures." App. Vol. I at 273. Recall that those standards require pre-housing assessment for medical and psychological issues but are silent on the detection of suicide risks in a housed inmate. And turnaround inmates received no such pre-housing screening.

Additionally, Warden Gerlach testified that training on the state jail standards "satisfie[d] the comprehensive suicide prevention program" requirement of "the marshal service contract" which requires the facility provide its officers training involving identifying, assessing, and preventing risks of suicide in inmates. *Id.* at 259. But again, the state jail standards make no mention of an officer's detection of suicidality in housed inmates. Further, as for the facility's policies, there is no evidence they contained content about how to identify and respond to mental health issues in housed inmates.

Because the written policies are silent on the identification of suicidal inmates, Warden Gerlach's testimony, viewed in the light most favorable to the Estate, attributes the knowledge officers have about how to identify and handle suicidal inmates to whatever on-the-job experience the officer happens to receive. He stated that the training officers received on how to notice behavioral and mental health problems in an inmate "is something that's trained through experience, not through a book or anything else, they

31

have to work there." App. Vol. IV at 22. And Warden Gerlach could not confirm whether the detention officers on duty while Mr. Thao was in the facility had received "any training to identify mental health problems" because such experiential learning necessarily varies officer to officer. *Id.* at 19–20.

However, GCCJA has pointed to officer testimony suggesting at least some officers receive training on "identifying inmates at risk of suicide and preventing suicide." Appellee Br. at 11. The district court noted testimony from Officer Farley that he was trained that an inmate presenting "[a]ny kind of threat of harm to oneself or any other needs to be dealt with" and brought to the nurse. App. Vol. IV at 196. Similarly, it noted Officer Duncan's testimony that he had received training on identifying mental health issues through noticing "change[s] in appetite," "appearance," and "behavior." *Id.* at 194.

Where the state jail standards (and the facility's policies) do not address suicide risks after the initial screening—which is not done for turnaround inmates like Mr. Thao—a reasonable juror could conclude the facility offered its officers no formalized training.[12] Instead, the juror could reasonably conclude that GCCJA hoped officers would

---

[12] The Estate need not prove that the facility offered *no* training on identifying mental health crises in inmates—the inquiry is whether it provided "*deficient* training." *Valdez v. Macdonald*, 66 F.4th 796, 816–17 (10th Cir. 2023) (emphasis added). "For liability, 'a municipality's failure to train its employees *in a relevant respect* must amount to "deliberate indifference."'" *Id.* at 819 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). A failure-to-train claim may be sustained on "the need for more or different training." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). What is contested here is whether GCCJA provided "its officers with formal

learn how to identify suicidal inmates "through experience." *Id.* at 22. And because that experience varied, a reasonable juror could find that not all detention officers were trained to identify pleas to be killed, such as Mr. Thao's, as indicators that the inmate was suicidal.

Additionally, a reasonable juror could reach the same conclusion by examining the detention officers' deposition testimony side-by-side. While Officer Farley stated he had learned what signs to look for to identify mental health issues, Officer Henneman answered in the negative when asked if he received "any training while [he was] at the jail . . . to identify someone who's having a mental health episode." App. Vol. II at 16. Notably, Officer Henneman was one of the officers who was present in the hallway, at various points, when Mr. Thao was in Cell 126 and orally expressing a desire to be killed.

From this evidence, viewed in the light most favorable to the Estate, a reasonable juror could infer that knowledge on how to identify a mental health crisis arbitrarily varied from one officer to the next because the facility had not implemented a formal and mandatory training for all officers. Moreover, a reasonable juror could look to Officer Henneman's statement to the paramedic after discovering Mr. Thao's unconscious body that Mr. Thao had been "yelling" prior to his suicide but "was fine," as further confirmation that Officer Henneman received no training on how to detect signs of an inmate suffering a mental health crisis. App. Vol. III at 263. The record, viewed most

_____

training on how to assess signs of mental illness," rather than expecting an officer to gain this knowledge through experience. Appellant's Br. at 36.

33

favorably to the Estate, shows Officer Henneman in the corridor outside cell 126 while Mr. Thao shouted "Nah, fucking kill me," and "Come shoot me. Come kill me – don't play this game. Man I'm fucking tired of this shit. Fucking kill me." App. Vol. III at 255. A reasonable juror could find that Officer Henneman could hear these cries. And where Officer Henneman reported to the paramedic that despite these pleas, he concluded Mr. Thao was "fine," a reasonable juror could further find that Officer Henneman had not been trained adequately.

Finally, Lieutenant Drewery's PowerPoint on mental health in the prison system fails to resolve these disputes of material fact related to officer training. Even accepting Lieutenant Drewery's testimony that the PowerPoint was presented at the facility two times before Mr. Thao's death, there is no way to determine whether any of the officers on duty attended. He confirmed the training was not mandatory. Indeed, on the one occasion Lieutenant Drewery gave the PowerPoint presentation at the facility to GCCJA officers, only five to ten attended, and there is no record of who they were.

## 2.    Underlying Constitutional Violation by an Individual Officer

As mentioned, a failure-to-train claim requires a predicate showing that the officers did in fact violate the decedent's constitutional rights.[13] *Crowson*, 983 F.3d at

---

[13] The Estate argues on appeal that it "need not show an underlying violation by an individual officer" for its failure-to-train claim "where, as here, there is evidence of systemic failure." Reply Br. at 18. We disagree. Evidence of a municipality's systemic failures cannot replace the requirement that, to succeed on a failure-to-train claim, a plaintiff must show a predicate constitutional violation committed by an individual. *See Crowson v. Wash. Cnty. Utah*, 983 F.3d 1166, 1187

1187. The district court did not reach this fact-intensive issue. GCCJA requests that, in the alternative, we affirm the grant of summary judgment because there was no underlying constitutional violation. But "[w]here an issue has been raised, but not ruled on, proper judicial administration generally favors remand for the district court to examine the issue initially." *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1238 (10th Cir. 2005).

We thus remand to the district court for it to consider in the first instance whether any individual officer violated Mr. Thao's right to be free from cruel and unusual punishment under the Eighth Amendment by acting with deliberate indifference toward his serious medical needs during his time at the facility. *See Cox*, 800 F.3d at 1248.[14]

## V.    CONCLUSION

For the foregoing reasons, we AFFIRM the grant of summary judgment to GCCJA on the excessive force claim, REVERSE the grant of summary judgment to GCCJA on

---

(10th Cir. 2020). Rather, evidence of a municipality's systemic failure can advance a separate claim. *Id.* at 1174. This is because such a claim represents a different theory of municipal liability. *Id.* A claim arising out of a municipality's systemic failures allows the plaintiff to show a constitutional violation through "the sum of multiple officers' actions taken pursuant to municipal policy." *Id.* at 1191. In other words, under a systemic failure theory of liability, "the municipality may not escape liability by acting through twenty hands rather than two." *Id.* But the Estate never pleaded a systemic-failure claim in its complaint, and we decline to create one on appeal. It brought a failure-to-train claim, which requires an underlying constitutional violation. *Id.* at 1187.

[14] We also express no opinion of whether the Estate has come forward with evidence to meet its burden to show any lack of training caused a constitutional violation.

the inadequate medical care claim, and REMAND for further proceedings consistent with this opinion.

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert                                          Jane K. Castro
Clerk of Court                                          Chief Deputy Clerk

November 26, 2025

Mr. John Spencer Bryan
Bryan & Terrill Law
3015 E. Skelly Drive, Suite 400
Tulsa, OK 74105

Jennifer J. Clark
Ogemdi Maduike
Sidley Austin
1501 K Street, NW, Suite 600
Washington, DC 20005

Mr. Glenn Katon
Katon Law
385 Grand Avenue, Suite 200
Oakland, CA 94610

RE:    **24-6226, Thao v. Grady County Criminal Justice Authority, et al**
       Dist/Ag docket: 5:19-CV-01175-JD

Dear Counsel:

Attached is a copy of the opinion of the court issued today in this matter. The court has
entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. 40(d)(1), any petition for rehearing must be filed within 14
days after entry of judgment. Please note, however, that if the appeal is a civil case in
which the United States or its officer or agency is a party, any petition for rehearing must
be filed within 45 days after entry of judgment. Parties should consult both the Federal
Rules and local rules of this court with regard to applicable standards and requirements.
In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length,
and no answer is permitted unless the court enters an order requiring a response. *See* Fed.
R. App. P. Rule 40 and 10th Cir. R. 40 for further information governing petitions for
rehearing.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of Court


cc:     Andrew A. Artus
        William Reynolds Moon Jr.
        Jamison Whitson


CMW/at